1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    HOOPA VALLEY TRIBE,                    Case No.  16-cv-04294-WHO

           Plaintiff,
8
                                           **ORDER RE MOTIONS FOR**
9       v.                                 **SUMMARY JUDGMENT, MOTIONS**
                                           **TO STRIKE, AND MOTION TO**
10   NATIONAL MARINE FISHERIES             **DISMISS**
     SERVICE, et al.,
11                                         Dkt. Nos. 33, 69, 88, 89, 98
           Defendants.

12

13                              **INTRODUCTION**

14        This order addresses parallel motions brought in two related cases, *Yurok Tribe v. Bureau*

15   *of Reclamation*, No. 16-cv-6863, and *Hoopa Valley Tribe v. Bureau of Reclamation*, No. 16-cv-

16   4294.  The plaintiffs in these two cases are tribes and fishing associations, seeking to protect

17   Southern California Northern California Coast Coho salmon in the Klamath River from negative

18   impacts of the Klamath River Project.  In both cases plaintiffs have moved for summary judgment

19   on their first claim against the federal defendants, asserting that the defendants violated 50 C.F.R

20   402.16, an implementing regulation of the Endangered Species Act ("ESA"), by failing to

21   reinitiate formal consultation following two years of record rates of disease among Coho salmon

22   in the Klamath River.  Plaintiffs seek a declaratory judgment that the federal defendants have

23   violated the ESA and an injunction putting protective water flows in place to reduce disease rates

24   while the federal defendants complete the formal consultation process.

25        The federal defendants and intervenor defendants oppose the motions.  They have also

26   filed motions to limit review to the Administrative Record.  Yurok Dkt. No. 42; Yurok Dkt. No.

27   43.  In addition, before the plaintiffs filed their motions for summary judgment, and before the

28   Yurok plaintiffs filed their case, the federal defendants moved to dismiss, or in the alternative to

United States District Court
Northern District of California

stay, the claims brought by Hoopa Valley.  Hoopa Dkt. No. 33.  This motion to dismiss has not yet been addressed and remains ripe.

With regard to the motion to dismiss against Hoopa Valley, I conclude that Claim III, unlawful taking of a listed species, is not cognizable against the National Marine Fisheries Service ("NMFS") because NMFS does not participate in running the Klamath Project and so is not responsible for any taking.  The remaining claims are cognizable, are not moot, and should not be stayed.  The motion to dismiss is GRANTED with regard to Claim III as brought against NMFS and is DENIED in all other respects.

I conclude that plaintiffs' reinitiation claim against the United States Bureau of Reclamation ("Bureau") is brought under the ESA citizen suit provision and that review of that claim is not limited to an administrative record.  The claim against NMFS, although brought under the Administrative Procedure Act ("APA"), is a failure to act claim and is therefore similarly not limited to an administrative record.  I therefore DENY defendants' motion to limit review.  Notably, however, I would reach the same result reviewing these claims under the administrative record as I do considering the extra-record evidence.  As a result, to simplify the issue, and to avoid any confusion or potential conflicts regarding the scope of extra-record evidence permitted for each claim, I will rely exclusively on the record evidence to assess the merits of plaintiffs' reinitiation claims.  Because the parties do not dispute that extra-record evidence may be considered to assess standing and to determine whether injunctive relief is appropriate, I will consider the extra-record evidence, where applicable, for these limited purposes.

With regard to the motions for summary judgment, I conclude that the federal defendants violated 50 C.F.R. 402.16 because they delayed two years before reinitiating formal consultation after the incidental take trigger was exceeded in 2014.  Preliminary injunctive relief, pending completion of formal consultation, is an appropriate remedy for this substantial procedural violation.  In general, plaintiffs' requested injunctive relief is supported by the best available science and plaintiffs' proposal that the parties' technical experts confer on the precise timing, duration, volume, and manner of any potential injunctive flows will allow the parties to address the Bureau's needs to maintain sufficient water for the sucker fish (two species of endangered fish

also impacted by the Klamath Project), comply with various regulations, and manage safety concerns.  Plaintiffs' motions for summary judgment on Claim I are GRANTED.  The precise details of the preliminary injunction will be determined as outlined below.

**BACKGROUND**

## I.  FACTUAL BACKGROUND

This case concerns the rate of *Ceratanova shasta* ("*C. shasta*") infection among Coho salmon in the Klamath River.  Yurok Dkt. No. 8 at 1.  Water flows on the Klamath River are altered and lowered by the Klamath Irrigation Project, a water project that provides water to irrigation districts in Oregon and Northern California.  *Id.*  The Klamath Project is operated by the Bureau, a federal agency that is required to comply with ESA regulations that prohibit the taking of any endangered or threatened species.

The history of the Klamath Project and its impact on the Coho salmon is long and complex, and will be discussed in greater detail when this Order addresses the motions for summary judgment.  Underlying the motions are these salient facts.  The Bureau is bound by a 2013 Biological Opinion and incidental take statement that outlines the projected impact of the Klamath Project's operations on threatened species and sets the permissible *C. shasta* disease rate among Coho salmon at 49 percent.  AR 1043-1075.  In 2014 and 2015, the Klamath River's Coho salmon population suffered unprecedented outbreaks of *C. shasta*, far exceeding the incidental take maximum outlined in the NMFS incidental take statement: 81 percent infection in 2014 and 91 percent in 2015.  AR 502.  In their complaints and motions for summary judgment, plaintiffs asserted that, per ESA regulations, following this violation of the incidental take statement, the Bureau and NMFS (collectively, "federal defendants") were required to reinitiate and complete formal consultation on the Klamath Project's operations, but failed to do so.  *See e.g.*, Yurok Dkt. No. 8 at 2.

In January, 2017, weeks after plaintiffs filed their motions for summary judgment, the Bureau sent letters to NMFS and FWS stating that it wanted to clarify that the agencies were now engaged in formal consultation.  AR 0001-04; AR 0005-08.  The Hoopa Valley plaintiffs contest that these letters are sufficient to show that the federal defendants have in fact reinitiated formal

consultation.  In contrast, the Yurok plaintiffs now concede that the federal defendants have reinitiated formal consultation but ask the court to order the defendants to perfect their formal consultation by following the procedures outlined in Section 402.14 for conducting formal consultation generally.

## II. PROCEDURAL BACKGROUND

On July 29, 2016, the Hoopa Valley Tribe filed suit against the Bureau and NMFS seeking declaratory and injunctive relief and alleging that the federal defendants are in violation of the ESA because they have failed to reinitiate formal consultation on the impact of Klamath Project operations on threatened Coho salmon.  Hoopa Dkt. No. 1.  Hoopa Valley's complaint asserts four claims for relief: (1) failure to reinitiate formal consultation on the 2013-2023 Klamath Project operations, brought under the citizen suit provision of the ESA and alternatively, under the APA against both the Bureau and NMFS; (2) failure to prepare an adequate Biological Opinion for the 2013-2023 Klamath Project operations as required under Section 7 of the ESA, brought against NMFS; (3) violation of Section 9 of the ESA by "taking" threatened Coho salmon in excess of the amount authorized in the incidental take statement, brought against both the Bureau and NMFS; and (4) violation of the APA and Magnuson-Stevens Fishery Conservation and Management Act by failing to consult on essential fish habitat, brought against both the Bureau and NMFS.  *Id.*

### A. Motion to Dismiss

The federal defendants moved to dismiss all of these claims, asserting that Claims I, III, and IV were not cognizable against NMFS, that Claim III failed against the Bureau because plaintiffs had failed to show an imminent Section 9 violation and because the Bureau had immunity from Section 9 liability, and that Claims I, II, & IV were "prudentially moot" because the agencies had already begun "informal consultation."  Hoopa Dkt. No. 33.  In the alternative, the federal defendants requested that the court stay claims I, II, and IV so that the agencies could focus on their informal consultation process.  *Id.* at 22.  The briefing and hearing schedule on the motion to dismiss was originally extended by stipulation of the parties.  After the Yurok case was filed and the Hoopa Valley and Yurok plaintiffs filed motions for summary judgment, the court extended the hearing on the motion to dismiss to be heard at the same time as these summary

United States District Court
Northern District of California

1    judgment motions.

2        **B.  Motion for Partial Summary Judgment**

3        The Yurok Tribe and commercial and conservation fishing groups filed their complaint on

4    November 29, 2016, mostly mirroring the claims raised by Hoopa Valley.  Yurok  Dkt. No. 1.

5    The Yurok Tribe's claims differ in two primary ways: (1) their Claim II does not specifically

6    challenge the 2013 Biological Opinion ("BiOp") but instead alleges generally that both the Bureau

7    and NMFS are in violation of their substantive duties under Section 7(a)(2) of the ESA; and (2)

8    their Claim III, the "taking" claim, is asserted only against the Bureau.  *Id.*

9        On November 30, 2016, and December 1, 2016, the Hoopa Valley and Yurok plaintiffs

10   moved for partial summary judgment on their failure to reinitiate claims, seeking a declaratory

11   judgment that the Bureau and NMFS are in violation of their legal duty to reinitiate formal

12   consultation and requesting injunctive relief.  Yurok Dkt. No. 8; Hoopa Dkt. No. 69.  Now that the

13   agencies have exchanged letters explicitly stating that they are engaged in formal consultation,

14   plaintiffs have made minor modifications to their requested relief.  At the January 27, 2017

15   hearing plaintiffs clarified that they currently seek three forms of relief: (1) an order directing

16   NMFS and the Bureau to perfect reinitiation of formal consultation by following the procedures

17   outlined in Section 402.14; (2) a declaratory judgment that the Bureau is in violation of Section

18   7(a)(2); and (3) injunctive relief while formal consultation is ongoing.  Because the Bureau will

19   "lock in" the 2017 irrigation allocation around April 1, 2017, and prevention flows may be needed

20   sooner to prevent additional harm to the Coho salmon, plaintiffs ask this Court to issue a decision

21   on this motion by mid-February, 2017.  *Id.*  In support of their motion for partial summary

22   judgment, plaintiffs submit various declarations and exhibits that relate to standing, whether the

23   federal agencies have reinitiated consultation, irreparable harm, the best available science on

24   reasons for and proposed measures against *C. shasta* infections, and the necessity and scope of the

25   requested injunctive relief.  *See generally*, Declarations in Support of Motion for Summary

26   Judgment, Yurok Dkt. Nos. 9-15.

27       The federal defendants oppose plaintiffs' motion for summary judgment, arguing that the

28   claim for declaratory relief is moot because the agencies have already reinitiated formal

United States District Court
Northern District of California

consultation.  They add that plaintiffs are not entitled to injunctive relief because (1) the requested relief is not narrowly tailored to the alleged procedural violation; (2) the requested relief may impact other endangered species in the Klamath River; (3) plaintiffs have not shown that they or the Coho salmon will be irreparably harmed absent the requested measures; and (4) the balance of harms weighs against granting plaintiffs' requested relief.  Federal Defendants' Opposition to Motion for Summary Judgment[1] ("Fed. Oppo.") Yurok Dkt. No. 47.

The Intervenor Defendants – irrigation and drainage districts that hold water contracts with the Klamath Project – also oppose plaintiffs' motion, asserting that plaintiffs' claim for declaratory relief fails because it was mooted when the agencies reinitiated formal consultation and because plaintiffs have failed to show that the Klamath Project causes each and every incidence of fish disease in the Klamath River.  Intervenor Opposition to Motion for Summary Judgment ("Int. Oppo.") Yurok Dkt. No. 48.  They also assert that plaintiffs should not be awarded injunctive relief because (1) plaintiffs' proposed protective flows have not been properly tested through a complete scientific process; (2) the proposed flows will require withholding over 100,000 acre-feet of water from the irrigation districts that rely on water for agriculture; (3) plaintiffs have failed to show irreparable injury; and (4) no injunction should be granted until the parties have had an opportunity to resolve any scientific factual disputes through an evidentiary hearing or through discovery.  *Id.*

Plaintiffs argue in reply that their claim is not moot because the agencies have not completed formal consultation and the court may still grant effective relief.  They maintain that their requested injunctive relief is supported by the best available science and is needed to protect the Coho salmon.  Yurok Reply Dkt. No. 54.

**C.  Motion to Limit Review**

On December 22, 2016, federal defendants filed a motion to limit review to the administrative record and to strike plaintiffs' extra-record evidence.[2]  Yurok Dkt. No. 42.  Federal

---

[1] The federal defendants and intervenor defendants filed virtually identical oppositions in both cases.

[2] Federal defendants move to strike in full plaintiffs' motion for partial summary judgment, or in the alternative, the portions of plaintiffs' motion "which cite to or rely upon the extra-record

United States District Court
Northern District of California

United States District Court
Northern District of California

defendants argue that plaintiffs' first claim is governed by the APA's "indivisible" standard and scope of review, and therefore review must be limited to the administrative record.  *Id.* at 10; Dkt. No. 49 at 6.  Defendant-intervenors moved to join the federal defendants' motion on December 23, 2016.  Dkt. No. 43.

Plaintiffs oppose the motion to limit review and to strike, arguing that the failure to consult claim arises under the ESA's citizen suit provision, not the APA, and therefore that the APA's scope of review does not apply.  Dkt. No. 44 at 13.  Plaintiffs further contend that, to the extent their claim against NMFS must be brought under the APA and not the ESA, review of this claim is similarly not limited to the record because "no such record exists where the agency has failed to act."  *Id.* at 16.  Plaintiffs do not oppose the defendant-intervenors' joinder.

I heard oral argument on all of these motions on January 27, 2017.

## MOTION TO DISMISS (BROUGHT AGAINST HOOPA VALLEY ONLY)

The federal defendants have moved to dismiss Hoopa Valley's claims.  Motion to Dismiss ("MTD") at 1 (Hoopa Dkt. No. 33).  They seek to dismiss Counts I, III, and IV against NMFS on the grounds that plaintiffs have failed to make out a cognizable claim against that entity, Count III against the Bureau because plaintiffs have failed to show an imminent Section 9 violation and because the Bureau is protected from Section 9 taking liability since it is operating within the terms and conditions of the 2013 BiOp's incidental take statement, and Counts I, II, and IV against both entities because those claims are "prudentially moot."  *Id.*  They also assert that, in the alternative, Counts I, II, and IV should be stayed pending the agencies' completion of the consultation process.  *Id.* at 2.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  A claim is facially plausible

evidence for impermissible purposes."  Dkt. No. 42 at 3.

when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

## I.   IS THERE A COGNIZABLE CLAIM AGAINST NMFS FOR COUNTS I, III, & IV?

The federal defendants argue that Counts I, III, and IV are not cognizable against NMFS. They assert that Count I fails under the ESA because the ESA citizen suit provision does not provide a cause of action for failure to reinitiate against the Secretary and fails under the APA because NMFS has no legal duty to reinitiate. *Id.* at 8. They contend that Count III is not cognizable because NMFS, as a consulting agency, does not participate in the "take" of any species. *Id.* at 13. And, they argue that Count IV fails because Section 1855(b)(4)(B) of the Magnuson-Stevens Fishery Conservation Act ("MSFCMA") does not place any duty on consulting agencies, like NMFS. *Id.* at 17.

### A.   Count I

### 1.   ESA

The federal defendants contend that the citizen suit provision of the ESA does not provide a cause of action for Count I against NMFS. Section 1540(g)(1)(A) of the citizen suit provision allows any person to bring a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment

to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." On its face, this broad language would seem to allow a plaintiff to bring suit against NMFS for violations of Section 402.16 and Section 402.14(i)(4), which are regulations implementing Section 7 of the ESA.

But the federal defendants correctly argue that this claim is impermissible against NMFS because NMFS is an administrator of the ESA and the Supreme Court has held that Section 1540(g)(1)(A) does not provide a cause of action to sue the Secretary (which includes the Secretary of the Interior, Secretary of Commerce, and their delegate services, such as NMFS) for "failure to perform [its] duties as administrator of the ESA." *Bennett v. Spear*, 520 U.S. 154, 174 (1997). In *Bennett*, the Court attempted to reconcile Section 1540(g)(1)(C), which provides a specific right to sue the Secretary for certain specific non-discretionary Section 1533 violations, with Section 1540(g)(1)(A), the general citizen suit provision. *Id.* at 173. The Court concluded that, because Section 1540(g)(1)(C) provides a specific, but limited, cause of action against the Secretary, Section 1540(g)(1)(A) cannot offer an alternative, general, cause of action. *Id.* It explained:

> "The opposite contention is simply incompatible with the existence of § 1540(g)(1)(C), which expressly authorizes suit against the Secretary, but only to compel him to perform a nondiscretionary duty under § 1533. That provision would be superfluous—and, worse still, its careful limitation to § 1533 would be nullified—if § 1540(g)(1)(A) permitted suit against the Secretary for any 'violation' of the ESA."

*Id.*

*Bennett* effectively holds that the Secretary may only be sued under the ESA in its capacity as a consulting agency pursuant to the specifications outlined in Section 1540(g)(1)(C). *Id.* As Hoopa Valley's failure to reinitiate claim does not fall under the non-discretionary duties outlined in Section 1553, and Hoopa Valley seeks to sue NMFS in its capacity as a consulting agency, Hoopa Valley's reinitiation claim against NMFS cannot be sustained under the ESA.

### 2.  APA

The federal defendants similarly argue that Count I cannot be maintained against NMFS under the APA because NMFS, as a consulting agency, does not have a duty to reinitiate

1   consultation.  MTD. at 10.

2   They contend that there is no duty, in the ESA or its regulations, that the Service (the

3   consulting agency) reinitiate consultation.  *Id.*  They note that Section 402.14(i)(4), which

4   provides that reinitiation of formal consultation is mandatory if the incidental take maximum is

5   triggered, refers only to the action agency and does not state that the Service, here NMFS, is

6   obligated to reinitiate consultation.  50 C.F.R. §402.14(i)(4) ("If during the course of the action the

7   amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is

8   exceeded, the *Federal agency* must reinitiate consultation immediately.") (emphasis added).  They

9   further argue that Section 402.16 does not impose a duty on NMFS to reinitiate formal

10   consultation, but only to "request" reinitiation of consultation.  50 C.F.R. §402.16 ("Reinitiation of

11   formal consultation is required and *shall be requested* by the Federal agency or by the Service, . . .

12   (a) If the amount or extent of taking specified in the incidental take statement is exceeded.")

13   (emphasis added).  They also highlight a number of other parts of the Act that focus on the action

14   agency's obligations with regard to initiating formal consultation and to cases that focus on the

15   action agency's obligations.  *See* Mot. at 10.

16   While the federal agencies' arguments might be compelling if this was an issue of first

17   impression, the Ninth Circuit has already addressed this precise issue multiple times and

18   confirmed that both the action agency and the consulting agency have a duty to reinitiate

19   consultation.  *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir.

20   2008) ("The duty to reinitiate consultation lies with both the action agency and the consulting

21   agency."); *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1076-77 (9th Cir. 2004)

22   (holding that discovery of new facts "mandates reinitiating formal consultations" and that "[the

23   consulting agency] was obligated to reinitiate consultation pursuant to 50 C.F.R. Section 402.16");

24   *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) ("The duty to

25   reinitiate consultation lies with both the action agency and the consultation agency.").  Indeed,

26   Judge Chhabria of this District recently rejected the arguments the federal defendants make here,

27   applying the Ninth Circuit's holding from *Salmon Spawning* that both the action agency and

28   consulting agency are obligated to reinitiate consultation.  *Pacificans for a Scenic Coast v. Cal.*

10

1   *DOT*, No. 15-cv-2090-VC, 2016 WL 4585768, *11 (N.D. Cal., Sep. 2, 2016) ("Consistent with

2   the plain text of [50 C.F.R. Section 402.16], the Ninth Circuit has stated that the duty to reinitiate

3   consultation lies with both the action agency and the consulting agency.").

4        The federal defendants' effort to distinguish this clear precedent is wholly unpersuasive.

5   Formal consultation is a collaborative process that requires the participation of both the Bureau

6   and NMFS.  The purpose of reinitiating formal consultation is not simply to check off a procedural

7   box, but to complete a formal consultation process that ensures to the extent possible that there are

8   no substantive violations of the ESA.  Both the NMFS and Bureau have a clear obligation to

9   participate in and complete this reinitiation process.  As the Ninth Circuit has already held, "[t]he

10  duty to reinitiate consultation lies with both the action agency and the consulting agency." *Salmon*

11  *Spawning*, 545 F.3d at 1229.  The defendants' claim that a reinitiation claim is not cognizable

12  against NMFS fails.

13       **B.  Count III**

14       The federal defendants assert that Count III, unlawful "taking" of a listed species, is not

15  cognizable against NMFS because NMFS does not participate in operating the Klamath Project

16  and so cannot be responsible for any "takings."  MTD. at 13.  Plaintiffs do not attempt to argue

17  otherwise and it appears clear that NMFS's role with regard to the Klamath Project is limited to

18  providing the Bureau with advice and biological opinions – actions which do not directly lead to

19  the "taking" of any species.  Count III is DISMISSED with regard to NMFS.

20       **C.  Count IV**

21       The federal defendants assert that Count IV is not cognizable against NMFS because the

22  statutory provision plaintiffs cite applies only to action agencies like the Bureau, and not to

23  NMFS.  MTD. at 17.  In their Amended Complaint plaintiffs cited to 16 U.S.C. § 1855(b)(4)(B),

24  which states in part:

25       Within 30 days after receiving a recommendation under subparagraph (A), a
26       Federal agency shall provide a detailed response in writing to any Council
         commenting under paragraph (3) and the Secretary regarding the matter.

27  16 U.S.C. § 1855(b)(4)(B).

28

United States District Court
Northern District of California

11

Plaintiffs do not dispute that Section 1855(b)(4)(B) does not apply to NMFS and explain that the reference to this section was a mistake – plaintiffs intended to reference 16 U.S.C. § 1855(b)(4)(A), which reads as follows:

> If the Secretary receives information from a Council or Federal or State agency or determines from other sources that an action authorized, funded, or undertaken, or proposed to be authorized, funded or undertaken, by any State or Federal agency would adversely affect any essential fish habitat identified under this chapter, the Secretary shall recommend to such agency measures that can be taken by such agency to conserve such habitat.

16 U.S.C. § 1855(b)(4)(A).  It is clear that the quoted section does apply to NMFS.  MTD. Oppo. at 24.  The argument that Claim IV should be dismissed because Section 1855(b)(4)(B) does not apply to NMFS is now moot as plaintiffs have since amended their complaint and reference the correct section in the operative version.  Second Amended Complaint ¶ 108 (Hoopa Dkt. No. 87).

In their reply the federal defendants argue that 16 U.S.C. § 1855(b)(4)(A) does not impose any duty on NMFS until it has received an assessment from a Federal agency.  MTD. Reply at 12 (Hoopa Dkt. No. 60).  They argue that because the Bureau has not provided an assessment to NMFS, it has no duty to act.  *Id.*  But this argument is contradicted by the language of the statute which reads, "If the Secretary receives information from a Council or Federal or State agency *or determines from other sources*" that an agency action would adversely affect any essential fish habitat "the Secretary shall recommend to such agency measures that can be taken by such agency to conserve such habitat."  16 U.S.C. § 1855(b)(4)(A).  The language of this section indicates that the Secretary has a duty to provide a recommendation even in circumstances where the Bureau has not provided an assessment, if it has otherwise determined that an agency action would adversely affect essential fish habitat.  Whether NMFS has made such a determination is an unresolved factual question.

Claim IV is cognizable against NMFS.

## II.   CLAIM III AGAINST THE BUREAU

The federal defendants assert that plaintiffs' taking claim against the Bureau fails because the 2013 BiOp's incidental take statement provides a safe harbor for Section 9 liability.  Reply at 14.  The defendants note that Section 7(c)(2) of the ESA states that "any taking that is in

United States District Court
Northern District of California

1   compliance with the terms and conditions specified in a written [incidental take] statement

2   provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the

3   species concerned."  16 U.S.C.A. § 1536(a)(2).  The "terms and conditions" of an incidental take

4   statement are the rules "with which the action agency must comply to implement the reasonable

5   and prudent measures" outlined by the consulting agency as necessary to limit impact to the

6   relevant species.  *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir.

7   2007).  "As long as any takings comply with the terms and conditions of the Incidental Take

8   Statement, the action agency is exempt from penalties for such takings."  *Id.*  The Bureau contends

9   that, even though it has exceeded the trigger of the incidental take statement and reinitiation of

10  formal consultation is required, the safe harbor protection of Section 7(c)(2) continues to exempt it

11  from penalties so long as it continues to operate the Klamath Project in line with the terms and

12  conditions of the incidental take statement.

13       The Ninth Circuit has repeatedly indicated that when an agency exceeds the "trigger" of an

14  incidental take statement, the relevant agencies are required to reinitiate formal consultation and

15  the safe harbor provision becomes invalid.  *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,

16  273 F.3d 1229, 1249 (9th Cir. 2001) ("In general, Incidental Take Statements set forth a 'trigger'

17  that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor

18  provision, and requiring the parties to re-initiate consultation."); *Allen*, 476 F.3d at 1039 (9th Cir.

19  2007) (noting that an Incidental Take Statement was invalid because it "fails to set forth a trigger

20  that would invalidate the safe harbor provision and reinitiate the consultation process"); *Wild Fish

21  Conservancy v. Salazar*, 628 F.3d 513, 531 (9th. Cir. 2010) (*quoting Ariz. Cattle Growers' Ass'n*,

22  273 F.3d at 1249) ("Incidental Take Statements set forth a 'trigger' that, when reached, results in

23  an unacceptable level of incidental take, invalidating the safe harbor provision.").

24       The Ninth Circuit has never applied this language to find an agency liable for Section 9

25  penalties after exceeding the "trigger" of an incidental take statement; instead, this language

26  comes exclusively from discussions regarding whether particular "triggers" were appropriate.  It is

27  therefore unclear exactly when or how the safe harbor provision of an incidental take statement

28  becomes invalid after the incidental take trigger is met and how courts should analyze a

subsequent Section 9 claim.  The federal defendants argue that the safe harbor provision would be virtually worthless if exceeding the "trigger" of the incidental take statement meant that the agency was immediately subject to Section 9 penalties.  This is a strong argument and harmonizes with the language of Section 7(c)(2), which provides that "*any taking* that is in compliance with the terms and conditions" of an incidental take statement, not just those below the "trigger" provided, are protected.  The safe harbor provision would be problematically weak if the "triggering" action itself subjected the agency to Section 9 penalties, even though it had complied with all the terms and conditions outlined in the relevant biological report.

However, the Bureau's assertion that the safe harbor remains in place indefinitely as long as it continues to comply with the terms and conditions of the incidental take statement cannot be reconciled with the Ninth Circuit cases.  Even if I accept that the safe harbor shields the Bureau from liability on the initial triggering take, given the Ninth Circuit's statements in *Arizona Cattle Growers' Association*, *Allen*, and *Salazar*, I cannot conclude that the safe harbor protects the Bureau for subsequent violations as well.  Because the incidental take statement was triggered in 2014 when *C. shasta* rates reached 81 percent, it is possible that the safe harbor provision has been invalid since 2015.  For the purposes of pleading, plaintiffs have demonstrated that it is plausible that the safe harbor provision is no longer valid and cannot protect the Bureau from Section 9 liability for future takings.

The federal defendants also argue that Count III must be dismissed because plaintiffs have failed to show an ongoing "taking" violation or an imminent future violation.  MTD. at 14.  The parties do not dispute that the ESA's citizen suit provision only provides a cause of action to enjoin ongoing violations or to prevent imminent future violations.  The ESA provides a cause of action "to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof."  16 U.S.C. § 1540(g)(1)(A).  In the context of the Clean Water Act, the Supreme Court has held that the phrase "in violation of" permits suits for ongoing, but not wholly past, violations.  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 58-59 (1987).  *Gwaltney* is instructive and supports the conclusion that the ESA citizen suit provision similarly permits a suit for ongoing, but not exclusively past, violations.  In

14

1   addition, the Ninth Circuit has held that the ESA citizen suit provision provides a cause of action

2   for "imminent" future violations that are "reasonably certain to occur." *Forest Conservation*

3   *Council v. Rosboro Lumber Co.*, 50 F.3d 781, 787 (9th Cir. 1995). Given this precedent, I agree

4   that the ESA citizen suit provision provides a cause of action for ongoing and imminent future

5   violations, but not for wholly past violations.

6        Defendants contend that a future violation is not imminent because higher water levels are

7   likely to permit disease-management measures that will keep the incidence of *C. shasta* below 49

8   percent.[3] Plaintiffs assert that they have made out a case for an imminent future violation because

9   they have demonstrated that operations under the 2013 BiOp are likely to lead to violations of the

10  incidental take statement in 2017. MTD. Oppo. at 21. Plaintiffs have demonstrated an imminent

11  Section 9 violation.

12       Plaintiffs have shown that in 2014 and 2015, while the Bureau was operating the Klamath

13  Project in accordance with the 2013 BiOp, the infection rate for *C. shasta* greatly exceeded the

14  incidental take maximum of 49 percent, reaching 81 percent in 2014 and 91 percent in 2015.

15  Although 2014 and 2015 were drought years, these infection rates, well over the incidental take

16  maximum, indicate a strong likelihood of future infection rates above 49 percent even in

17  substantially wetter years. Although the federal defendants point out that the 2016 infection rates

18  did not exceed 49 percent, the 2016 rates still reached 48 percent, just one percent under the

19  trigger. This high infection rate, in a much wetter year, is not particularly comforting; plaintiffs

20  assert that it likely would have been higher if not for a controlled spill event in March 2016 and

21

22  [3] It is not clear that a violation of the incidental take statement's "trigger" is the proper measure for
    a future Section 9 violation. An incidental take statement offers a complete safe harbor for any
23  taking "that is in compliance with the terms and conditions" of the take statement. 16 U.S.C.A. §
    1536(a)(2). But absent an incidental take statement, an agency is not permitted to take a listed
24  species in any amount. 16 U.S.C.A. § 1538(a)(1)(B) ("[W]ith respect to any endangered species
    of fish or wildlife . . . it is unlawful for any person subject to the jurisdiction of the United States
25  to (B) take any such species . . . ." The Ninth Circuit has repeatedly stated that exceeding the
    "trigger" of an incidental take statement invalidates the safe harbor provision. *See, e.g., Ariz.*
26  *Cattle Growers' Ass'n*, 273 F.3d at 1249 ("In general, Incidental Take Statements set forth a
    'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the
27  safe harbor provision, and requiring the parties to re-initiate consultation."). The court has not
    applied this rule to a Section 9 claim, but if the safe harbor provision becomes invalid, logically
28  the agency would then be prohibited from any taking of the listed species, as the ESA provides,
    not solely prohibited from takings in excess of the "trigger."

United States District Court
Northern District of California

increased precipitation that allowed the Bureau to release flows above the 2013 BiOp mandatory minimums in the winter and fall.  MTD. Oppo. at 22.  They argue that if the Bureau is permitted to operate the Project solely in compliance with the 2013 BiOp minimum flows, and is not required to issue more favorable flows as they did in 2016, the infection rate is likely to exceed the incidental take trigger again in 2017.  And, given the three year lifespan of the Coho salmon, the failure to protect them this year could cause irreparable harm.

Plaintiffs have made a strong showing that infection rates are likely to exceed the incidental take statement's 49 percent trigger in 2017 if the Bureau continues to operate the Klamath Project in accordance with the 2013 BiOp's minimum flows.  This is more than sufficient to show the likelihood of an imminent future Section 9 take.  Plaintiffs have made out a valid Section 9 claim against the Bureau.

### III. SHOULD CLAIMS I, II & IV BE DISMISSED AS PRUDENTIALLY MOOT?

In their motion to dismiss, filed in October, 2016, the federal defendants asserted that Counts I and II were "prudentially moot" because the agencies were already involved in some kind of informal consultation process, and that Count IV was "prudentially moot" because the agencies had a schedule in place to complete consultation under the Magnuson Stevenson Act.  MTD. at 19.  The federal defendants have since updated their position, now asserting that claims I and II are entirely moot because the agencies have definitively reinitiated formal consultation.  I address these arguments in the mootness discussion on the motion for summary judgment.  For the reasons outlined there, I conclude that claims I and II are not moot because plaintiffs may still be granted effective relief on these claims.

The federal defendants maintain that Claim IV is moot because the agencies have a schedule in place to complete consultation.  MTD. at 19.  Plaintiffs do not dispute this but argue that it is still only speculative whether NMFS will actually provide the required recommendations.  They note that NMFS's obligation under 16 U.S.C. § 1855(b)(4)(A) is not to consult, but to provide recommendations to the Bureau.  They highlight that it is undisputed that NMFS has not yet complied with this obligation.  16 U.S.C. § 1855(b)(4)(A) ("[T]he Secretary shall recommend to such agency measures that can be taken by such agency to conserve such habitat.").  While it

United States District Court
Northern District of California

1    appears the agencies are now working to meet the requirements of 16 U.S.C. § 1855(b)(4)(A),

2    they have not yet done so.  The claim does not yet appear moot.

3    **IV.  SHOULD CLAIMS I, II & IV BE STAYED?**

4        In the alternative, the federal defendants request that Counts I, II, and IV be stayed while

5    the agencies complete consultation.  MTD. at 22.  The defendants argue that a stay will allow the

6    agencies to focus on completing the consultation process and will not cause hardship to plaintiffs

7    because there is no imminent threat of danger to the Coho salmon.  As discussed with regard to

8    Count III, plaintiffs have presented a convincing case that the Bureau is likely to exceed the

9    incidental take statement trigger in 2017 if they continue to operate the Klamath Project in

10   compliance with the 2013 BiOp minimum flow requirements.  The 2013 BiOp concludes

11   generally that *C. shasta* is the biggest threat to Coho salmon and its no-jeopardy determination

12   relies on the presumption that *C. shasta* rates will not exceed the incidental take trigger.  AR 1011.

13   Because continued *C. shasta* rates above the incidental take trigger will have a negative effect on

14   Coho salmon, and this total impact has not been studied, there is a likelihood of imminent harm to

15   the Coho salmon.  Plaintiffs have demonstrated a need for immediate relief and a stay is not

16   appropriate.

17                          **MOTION TO STRIKE**

18       The federal defendants move to limit review on plaintiffs' motions for summary judgment

19   to the administrative record.  The defendant-intervenors' unopposed motion to join the motion to

20   limit review is GRANTED.  However, because I conclude plaintiffs' claims are not limited to an

21   administrative record, the motion to strike and limit review is DENIED.  Nevertheless, because

22   my substantive analysis of the motion for summary judgment would not change if I were to limit

23   review to an administrative record, and because the extra-record evidence raises a number of hard-

24   to-resolve practical and procedural issues, I only consider the record evidence in evaluating the

25   merits of plaintiffs' reinitiation claims.

26                           **DISCUSSION**

27   **A.  Failure to Reinitiate Consultation Under the Endangered Species Act**

28       Plaintiffs allege that the Bureau and NMFS failed to reinitiate formal consultation on the

                                   17

Klamath Project operations, in violation of ESA implementing regulation 50 C.F.R. § 402.16.

Section 402.16 provides in relevant part:

> Reinitiation of formal consultation is required and shall be requested by the Federal agency [i.e., the Bureau] or by the Service [i.e., NMFS], where discretionary Federal involvement or control over the action [i.e., the Klamath Project operations] has been retained or is authorized by law and:
> (a) If the amount or extent of taking specified in the incidental take statement is exceeded;
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
> (c) . . . ; or
> (d) . . . .

50 C.F.R. § 402.16.  "The duty to reinitiate consultation lies with both the action agency and the consulting agency.  *Salmon Spawning*, 545 F.3d at 1229.  Reinitiation of consultation requires the appropriate consulting agency to issue a new Biological Opinion before the agency action may continue.  *Simpson Timber*, 255 F.3d at 1076.

Plaintiffs contend that federal defendants' duty to reinitiate consultation has been triggered under paragraph (a) because in 2014 and 2015 *C. Shasta* infection rates exceeded the permissible limit set forth in the incidental take statement, and under paragraph (b) because new information reveals effects of the Klamath Project operations that may affect threatened Coho salmon to an extent not previously considered.  Yurok Dkt. No. 1 at 30-31.

**B.  Scope of Review**

While plaintiffs bring the same failure to reinitiate claims against both the Bureau and NMFS, the claim against the Bureau may be brought under the ESA citizen suit provision, while the claim against NMFS, as discussed above, may only be brought under the APA.  The appropriate scope of review is not necessarily the same for each claim.  I will address them each in turn.

**1.  The ESA claim against the Bureau**

The parties do not dispute that the claim against the Bureau is brought under the ESA's citizen suit provision, but dispute whether the APA's scope of review, nevertheless, applies to that

claim.[4]

Federal defendants contend that review of an ESA claim is governed by the APA, and thus must be limited to the administrative record.  Yurok Dkt. No. 49 at 9.  The APA provides a right to judicial review for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  When considering a claim arising under the APA, the scope of judicial review is confined to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party.").  Federal defendants assert that the APA's standard and scope of review are "inextricably related" and separating these review principles would be "illogical" and contrary to binding precedent.  Yurok Dkt. Nos. 42 at 10-11 & 49 at 9.

In response, plaintiffs argue that the APA's scope of review does not govern their claim brought under the ESA citizen suit provision, which "creates an express, adequate remedy" at law. *Washington Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005).  "[B]ecause the APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court,' 5 U.S.C. § 704," plaintiffs assert that it is inapplicable to their claim. *Bennett v. Spear*, 520 U.S. at 161-62.  The citizen suit provision creates a private right of action allowing individuals to bring suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540.  The Court has expressly recognized that the ESA's citizen suit provision provides "a means by which private parties may enforce the substantive provisions of the ESA against" federal agencies like the Bureau. *Bennett v. Spear*, 520

---

[4] The parties agree that the APA's "arbitrary and capricious" standard of review applies to plaintiffs' ESA claim.  Yurok Dkt. Nos. 42 at 10 & 44 at 11.  Under the APA, a reviewing court must "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706.  As explained by the Ninth Circuit, "[b]ecause ESA contains no internal standard of review, section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, governs review of the [federal agency's] actions and the normal arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law standard applies." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (internal quotations and citation omitted).

United States District Court
Northern District of California

1   U.S. at 173.  Thus, "[p]laintiffs' suits to compel agencies to comply with the substantive

2   provisions of the ESA arise under the ESA citizen suit provision, and not the APA." *Washington*

3   *Toxics*, 413 F.3d at 1034; *see W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir.

4   2011) ("We review claims brought under the ESA under the citizen-suit provision of the ESA or,

5   when the citizen-suit provision is unavailable, under the APA.").

6           Plaintiffs further contend that although the APA's scope and standard of review are set

7   forth in the same section, 5 U.S.C. § 706, "courts have not treated them as indivisible, particularly

8   where the case challenges an agency's failure to discharge a legal duty."  Dkt. No. 44 at 12.  In

9   support of their argument, plaintiffs rely on the Ninth Circuit's decisions in *Washington Toxics*

10  and *Kraayenbrink*, cases where the court considered whether a federal agency's failure to consult

11  violated the ESA.

12          In *Washington Toxics*, plaintiffs brought an ESA citizen suit against the Environmental

13  Protection Agency ("EPA") for its alleged failure to consult with the NMFS regarding the effects

14  of its ongoing pesticide registrations.  "After a hearing and consideration of voluminous evidence

15  bearing on the appropriate scope of injunctive relief," including evidence on the effects of the

16  challenged pesticides, the district court enjoined the EPA's authorization of the use of certain

17  pesticides pending compliance with the ESA.  *Washington Toxics*, 413 F.3d at 1031.  The

18  intervening defendants argued on appeal that the district court erred by failing to limit review to

19  the administrative record in accordance with APA standards.  *Id*. at 1034.  The Ninth Circuit

20  rejected this argument and stated that the lower court "correctly held . . . that the ESA citizen suit

21  provision creates an express, adequate remedy."  *Id*.  The Ninth Circuit concluded that "[b]ecause

22  [the ESA] independently authorizes a private right of action, the APA does not govern the

23  plaintiffs' claims.  Plaintiffs' suits to compel agencies to comply with the substantive provisions of

24  the ESA arise under the ESA citizen suit provision, and not the APA."  *Id*.

25          In *Kraayenbrink*, plaintiffs sued the Bureau of Land Management ("BLM") under the ESA

26  citizen suit provision, alleging that BLM violated the ESA by failing to consult with FWS prior to

27  approving nationwide grazing regulations.  The district court admitted plaintiffs' extra-record

28  evidence in support of their claim that the regulations "may affect" endangered species and thus

United States District Court
Northern District of California

1    trigger formal consultation under the ESA.  *Kraayenbrink*, 632 F.3d at 497.  On appeal, the

2    intervening defendants argued that the court could not consider materials outside the record in

3    conducting a review under the ESA.  *Id.*  In upholding the district court's decision with respect to

4    plaintiffs' ESA claim, the Ninth Circuit reaffirmed its holding in *Washington Toxics* that "the

5    APA applies only where there is 'no other adequate remedy in a court,' 5 U.S.C. § 704, and—

6    because the ESA provides a citizen suit remedy—the APA does not apply in such actions." *See*

7    *id.* (citing *Washington Toxics*, 413 F.3d at 1034).

8         The Bureau and NMFS argue that plaintiffs' reliance on *Washington Toxics* and

9    *Kraayenbrink* is misplaced as neither case "announce[d] the wholesale (and unexplained)

10   abandonment of administrative review principles for ESA citizen-suit claims." Dkt. No. 42 at 12.

11   Federal defendants further contend that these decisions are no longer good law in light of *Karuk*

12   *Tribe of California v. United States Forest Service*, a more recent en banc Ninth Circuit decision.

13   681 F.3d 1006, 1017 (9th Cir. 2012).  Dkt. Nos. 42 at 12-13 & 49 at 14-16.  According to NMFS

14   and the Bureau, *Karuk Tribe* "definitively dispelled" confusion in the district courts caused by

15   *Washington Toxics* and *Kraayenbrink* in holding that a failure to consult claim under the ESA is a

16   record review case and reviewed under the APA.  Dkt. Nos. 42 at 13 & 49 at 14.

17        In *Karuk Tribe*, the Ninth Circuit considered whether the Forest Service's approval of

18   notices of intent to conduct mining activities in the Klamath National Forest amounted to "agency

19   action" that "may affect" threatened Coho salmon and trigger consultation.  However, as noted by

20   plaintiffs, the Ninth Circuit did not "hold" that the record review under the APA is required in

21   ESA cases; rather, in the "Standard of Review" section the court simply stated "[b]ecause this is a

22   record review case, we may direct that summary judgment be granted to either party based upon

23   our review of the administrative record." *Karuk Tribe*, 681 F.3d at 1017.  There is no indication

24   that the Ninth Circuit intended this statement to overrule the reasoning in *Washington Toxics* and

25   *Kraayenbrink*; those cases are neither cited nor discussed in *Karuk Tribe*.

26        Other courts considering failure to act claims under the ESA have similarly rejected the

27   argument that *Karuk Tribe* silently overrules *Washington Toxics* and *Kraayenbrink*.  *See*

28   *Northwest Coal. for Alternatives to Pesticides v. EPA*, 920 F. Supp. 2d 1168, 1174 (W.D. Wash.

2013) (holding "*Karuk Tribe* cannot reasonably be read to implicitly or silently overrule the Ninth Circuit's reasoned holdings that, in circumstances where a plaintiff challenges a federal agency's failure to act under the citizen suit provision of the ESA, review is not confined to an administrative record"); *Ellis v. Housenger*, No. C-13-1266-MMC, 2015 WL 3660079, at *3 (N.D. Cal. June 12, 2015) (rejecting the argument that *Karuk Tribe* silently overrules *Washington Toxics* and *Kraayenbrink* given that it cites to neither case and "does not address in any manner the issue of whether evidence outside the administrative record can be considered").

Because the ESA provides a citizen suit remedy for plaintiffs' failure to consult claim, the APA's record review provision does not apply and "evidence outside the administrative record [may be considered] for the limited purposes of reviewing Plaintiffs' ESA claim." *Kraayenbrink*, 632 F.3d at 497.

### 2.  APA claim against NMFS

While the reinitiation claim against the Bureau may be brought under the ESA, as discussed with regard to the motion to dismiss, the claim against NMFS may only be brought under the APA.  Plaintiffs assert that the court may nevertheless consider extra-record evidence in reviewing the claim against NMFS because in APA failure to act cases review is not limited to the administrative record.  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (when a plaintiff seeks to compel agency action unlawfully withheld or unreasonably delayed "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record"); *S.F. Baykeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) ("As this case concerns agency inaction, there can be no final agency action that closes the administrative record or explains the agency's actions").  "The reason for this rule is that when a court is asked to review agency inaction before the agency has made a final decision, there is often no official statement of the agency's justification for its actions or inactions."  *S.F. Baykeeper*, 297 F.3d at 886.

The federal defendants raise two primary objections to this argument.  First, they argue that plaintiffs did not bring a "failure to act" claim under Section 706(1) of the APA, and instead brought a Section 706(2)(A) claim, alleging that the agencies' failure to reinitiate was arbitrary

and capricious.  While plaintiffs reference only Section 706(2)(A) as the section authorizing their

claim in the complaint, the substance of their claim – that the federal agencies have failed in a duty

to reinitiate and seeking to compel the agencies to reinitiate formal consultation – is easily read as

a failure to act claim under Section 706(1).  As plaintiffs' pleadings support a failure to act claim

and Section 706(1) authorizes such a claim, I will consider the reinitiation claim against NMFS as

a failure to act claim.

Second, the federal defendants distinguish *Friends of the Clearwater* and *S.F. Baykeeper*

as both being administrative record cases in which the court merely permitted limited

supplemental materials to account for changes in circumstances while the case was ongoing, not to

permit all extra-record evidence.  Yurok Dkt. No. 49 at 12.  *See Friends of the Clearwater*, 222

F.3d at 560-561 (explaining that extra-record evidence prepared after the onset of legal

proceedings may "be relevant to the question of whether relief should be granted"); *S.F.*

*Baykeeper*, 297 F.3d at 886 ("As this case concerns agency inaction, there can be no final agency

action that closes the administrative record or explains the agency's actions.  Accordingly, it was

not an abuse of discretion for the district court to rely upon the Program Review document.").  The

court's review of extra-record evidence was fairly limited: in *Friends of the Clearwater* the court

considered supplemental studies, which were not prepared until after the litigation had

commenced, that demonstrated the defendants had rectified the alleged violation, 222 F.3d at 559-

561, while in *S.F. Baykeeper* the court considered a document prepared by the agency during the

litigation that outlined the agency's justification for its inaction.  297 F.3d at 886

*Friends of the Clearwater* and *S.F. Baykeeper* make clear that review is not wholly limited

to an administrative record in a failure to act case, but they are not entirely clear on what extra-

record evidence may be considered.  A broad reading of these cases could permit the court to

review any extra-record evidence submitted in this case, while a narrower reading might limit the

court to considering only particular extra-record documents.  The parties have submitted a

substantial amount of extra-record evidence; trying to determine whether each piece of evidence

falls under a narrow reading of *Friends of the Clearwater* and *S.F. Baykeeper* would require

substantial judicial resources.  It is not clear that these cases permit a court to consider all extra-

United States District Court
Northern District of California

United States District Court
Northern District of California

record evidence in a failure to act APA case.  I am therefore left with the unpleasant options of (1)

expending substantial time and effort parsing through the extra-record evidence provided,

attempting to assess whether it should be considered in a failure to act case, and (2) adopting a

potentially overbroad reading of these cases.  Luckily, because I conclude that my analysis would

be the same regardless of whether I review this claim under the administrative record or if I

consider extra-record evidence, I can avoid making this unpalatable choice. I will limit my review

of the merits of plaintiffs' reinitiation claims to the documents and evidence contained in the

administrative record.  As discussed below, this does not change the analysis as the administrative

record provides ample evidence to support plaintiffs' claims.

### 3.   Although not required, I will limit review to the administrative record

The parties do not dispute that extra-record evidence may be considered in a record review

case to demonstrate standing and the necessity for injunctive relief.  Dkt. No. 42 at 1 n.1.  A

significant portion of the extra-record evidence in dispute has been offered for these purposes.  *Id.*

The federal defendants identify a limited number of documents that they believe do not fall under

either of these categories.  Plaintiffs object to this list and assert that virtually all of these

documents are offered to establish standing or to show irreparable harm and the need for

injunctive relief.  After reviewing these documents, I conclude that most of the extra-record

evidence is indeed relevant to those issues and may be considered for those purposes.

Defendants' motion to strike and to limit review to the administrative record is DENIED.

However, in assessing the merits of the reinitiation claims, I will voluntarily limit my review to

those documents included in the record.

### MOTION FOR SUMMARY JUDGMENT

Plaintiffs seek summary judgment on their claim for declaratory judgment that the federal

defendants have violated the ESA and implementing regulation 50 C.F.R. § 402.16 by failing to

reinitiate formal consultation.  They seek an order directing the agencies to perfect formal

consultation; a declaratory judgment that the Bureau is in violation of Section 7(a)(2); and

injunctive relief while formal consultation is ongoing.  Yurok Dkt. No. 8 at 2.  With regard to the

requested injunctive relief the plaintiffs propose two types of flows: "(1) prevention flows to flush

out the worms that host the *C. shasta* spores that cause disease (and remove their habitat); and (2) emergency dilution flows to limit the spread of disease when disease rate or spore concentrations reach certain thresholds, reveling that the prevention flows proved insufficient." *Id.*

### LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## I.  PLAINTIFFS' REINITIATION CLAIM

### A.    Section 7

Plaintiffs contend that the Bureau and NMFS have failed to comply with Section 7 of the ESA by failing to reinitiate consultation following high rates of *C. shasta* disease among Coho salmon in 2014 and 2015.  Yurok Dkt. No. 8 at 4.  Section 7 prohibits federal agencies from taking any action that may jeopardize the survival of any listed species.  It provides:

> Each federal agency shall, in consultation with and with the assistance of the
> Secretary, insure that any action authorized, funded, or carried out by such agency

United States District Court
Northern District of California

(hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . .

16 U.S.C. § 1536(a)(2).  "Agency action" is defined broadly and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, and includes the operation of the Klamath Project.

Section 7 lays out a consultation process where action agencies, like the Bureau, work with consulting agencies, like NMFS, to produce a biological opinion analyzing the impact that a proposed agency action will have on any listed species.  16 U.S.C. § 1536(b)(3)(a); 50 C.F.R. § 402.14(g)-(h).  If, through the biological opinion, NMFS determines that the proposed action will jeopardize the survival of a threatened or endangered species, it should lay out a reasonable alternative that would prevent any adverse impact.  *Id.*

If NMFS determines that an agency action will not place any listed species in jeopardy, it may include in its opinion an "incidental take statement."  The ESA prohibits any "take" of a listed species, which includes causing harm to the species itself or to the species' essential habitat. 16 U.S.C. § 1538(a)(1); § 1532(19); § 222.102.  An "incidental take statement" shields an acting agency from liability for the taking of a listed species, lays out the amount and extent of taking projected, and sets terms and conditions the agency must follow to retain its immunity.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  An incidental take statement provides a safe harbor to the acting agency as "any taking that is in compliance with the terms and conditions specified in [the incidental take statement] shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1536(o)(2); *see* 16 U.S.C. § 1536(b)(4)(C).

An incidental take statement also functions as a check on the accuracy of the biological opinion's conclusions because any taking that exceeds the maximum take projected by the take statement triggers an obligation on the part of the agencies to reinitiate formal consultation.

Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and

(a) If the amount or extent of taking specified in the incidental take statement is

26

1

exceeded; [or]

2

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered . . . .

3

4

50 C.F.R. § 402.16 & (a)-(b).

5

**B. The 2013 BiOp and Incidental Take Statement**

6

The Klamath Project is currently operated in accordance with the 2013 BiOp that was

7

completed in May, 2013 after formal consultation between the Bureau and NMFS and after years

8

of prior consultations and environmental litigations.  AR 649-1255.  A brief history of these events

9

is outlined below.

10

In *Pacific Coast Fed'n of Fishermen's Ass'ns  v. Bureau of Reclamation ("PCFFA I")*,

11

138 F. Supp. 2d 1228, 1251 (N.D. Cal. 2001), following a similar challenge, Judge Armstrong

12

ordered the Bureau to complete consultation on its 2000 operating plan for the Klamath Project

13

and enjoined the agency from releasing any water that would result in water levels at Iron Gate

14

Dam below the minimum flow levels that had been recommended by an expert retained by the

15

Department of the Interior to assess the needs of the various fish species in the lower Klamath

16

River, Dr. Hardy.  In 2002, following this ruling, NMFS released a biological report determining

17

that the proposed Project operations for 2002-2012 would result in insufficient river flows to

18

support Coho spawning, rearing, and out-migration and developed an alternative that set minimum

19

flows at the level proposed by Dr. Hardy.  *PCFFA v. Bureau of Reclamation ("PCFFA II")*, 426

20

F.3d 1082, 1088 (9th Cir. 2005).  However, the NMFS did not require the Bureau to implement

21

these higher minimum flows for the first eight years of the plan.  *Id.*  The Ninth Circuit concluded

22

that the NMFS's biological opinion was arbitrary and capricious and remanded the case to Judge

23

Armstrong "to craft appropriate injunctive relief."  *Id.* at 1095.  In 2006 Judge Armstrong issued

24

an injunction requiring minimum flows at 100 percent of the Coho salmon needs, as identified by

25

NMFS and Dr. Hardy.  *PCFFA v. Bureau of Reclamation ("PCFFA III")*, No. 02-cv-2006-SBA,

26

2006 WL 798920, at *8 (N.D. Cal. Mar. 27, 2006).

27

In 2012, the Bureau again asked NMFS to consult on the Klamath Project.  NMFS 001-

28

003.  After several months of consultation, NMFS released the current 2013 BiOp which assesses

United States District Court
Northern District of California

27

the likely impact of the Project's 2013-2023 operations.  AR 649-1255.  In the 2013 BiOp, NMFS identifies *C. shasta* as the most serious threat to Coho salmon, and notes increasing rates of *C. shasta* disease are largely due to "the reduction in magnitude, frequency, and duration of mainstem flows from the natural flow regime" as a result of Klamath Project operations.  AR 1006.  The 2013 BiOp provides for minimum spring flows and notes that while "these proposed minimum daily flows are not likely sufficient to dilute actinospore concentrations below 5 genotype II spores/L when actinospore concentrations are high, these minimum daily flows provide a limit to the increase in disease risks posed to coho salmon under the proposed action . . . ."  AR 1008-1009.  The BiOp also outlines a "real-time disease management" system that would allow for pulse flows to flush out polychaete worms and their habitat when surplus water is available.  AR 1011.  Based on the minimum spring flows and the disease management plan, the NMFS concluded that the 2013-2023 operations "will result in disease risks to coho salmon that are lower than under observed POR conditions yet higher than under natural flow conditions."  AR 1012.

Because it concluded that the 2013-2023 operations would not place Coho salmon in jeopardy, the NMFS included an incidental take statement in its 2013 BiOp outlining the permissible rates of *C. shasta* disease among Coho salmon.  AR 1043-1075.  Using Chinook salmon as a surrogate measure,[5] the NMFS set the highest percentage of permissible *C. shasta* infection at 49 percent measured by quantitative polymerase chain reaction testing.  AR 1055-1056.  It chose the 49 percent measure because this was the highest observed rate of infection since monitoring had begun and because the NMFS believed that the 2013-2023 operations would reduce the *C. shasta* disease rates over the prior years of operations, meaning that *C. shasta* rates would never reach this historic high.  *Id.*  It noted that "If the percent of *C. shasta* infections for Chinook salmon juveniles in the mainstem Klamath River between Shasta River and Trinity River during May to July exceed these levels (i.e., 54 percent infection via histology or 49 percent infection via QPCR), reinitiation of formal consultation will be necessary."  *Id.*  It also concluded

---

[5] Chinook salmon were used as a surrogate because they are more plentiful than Coho salmon, have a similar susceptibility to *C. shasta* disease, and because Chinook disease monitoring had been in place since 2004.  AR 1055

that "[i]n instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation."  AR 1075

### C.  Exceeding the Take Statement and Subsequent Agency Action

In 2014 and 2015, the first two years of operation under the 2013 BiOp, *C. shasta* rates among juvenile salmon exceeded the 49 percent incidental take trigger, reaching 81 percent in 2014 and 91 percent in 2015.  AR 213.  In July, 2015, the Bureau sent a letter to NMFS noting that "unprecedented, multi-year drought conditions have persisted which have caused variations in operations and hydrologic conditions that were not anticipated at the time the Proposed Action was analyzed in the BiOp."  AR 544.  Given these unexpected conditions, the Bureau sought "to begin comprehensive discussions to clearly establish a path forward to resolve the outstanding issues."  *Id.*

NMFS responded in a March, 2016 letter, confirming that the *C. shasta* rates exceeded the incidental take statement in 2014 and 2015.  AR 503.  In its letter, NMFS did not suggest reinitiating formal consultation, but instead explained that it believed the 2013 BiOp was still valid because it "fully considered the expectation that disease infection rates would generally be higher in dry years" and instead proposed revising the 2013 incidental take statement to account for higher disease rates among the Coho salmon.  *Id.*

In July, 2016, NMFS, the Fish and Wildlife Service (FWS), the Bureau, and the Yurok, Karuk, and Hoopa Valley Tribes organized a disease technical advisory team ("DTAT") to compile the best available science on *C. shasta* in order to determine the best measures for reducing *C. shasta* infection rates.  To assist the technical team, FWS provided four technical memos detailing the peer reviewed scientific information available on fish infection, spores, polychaetes, and geomorphic conditions in the Klamath River.  AR 252-319.  The Tribal technical experts used these memos to develop proposed mitigation measures to lower *C. shasta* infection rates and submitted a Guidance Document to DTAT in November, 2016.  AR 231-319.

The Guidance Document recommends a number of different types of flows to reduce *C. shasta* infections.  The Bureau, FWS, and NMFS provided comments on the Guidance Document, raising concerns that the Guidance Document "does not comprehensively summary [sic] the

conclusions of the tech memos" and that "[a]dditional detail needs to be provided for the scientific bases of timing, duration, and frequency intervals of events for *all* management options."  AR 133-134.  Although the agencies are continuing to consult with the Tribe's technical experts, the federal defendants have not agreed to implement any of the recommendations in the Guidance Document, two of which are at issue in plaintiffs' request for an injunction: (1) flushing flows in the winter and spring to flush out host worms; and (2) emergency dilution flows if spore concentrations spike during juvenile salmon outmigration.  AR 237-243.

### D.  Obligation to Reinitiate Formal Consultation

16 U.S.C. § 1540(g)(1) requires an acting agency (i.e. the Bureau) and a consulting agency (i.e. NMFS) to reinitiate formal consultation if "the amount or extent of taking specified in the incidental take statement is exceeded" or if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16.  This first circumstance was triggered when *C. shasta* rates exceeded the 49 percent amount outlined in the incidental take statement.  The second was triggered when consecutive drought years "caused variations in operations and hydrologic conditions that were not anticipated at the time the Proposed Action was analyzed in the BiOp" and resulted in much higher infection rates than the NMFS thought possible.  AR 544.

It is undisputed that the Bureau and NMFS were obligated to reinitiate formal consultation after the *C. shasta* rates exceeded the maximum percentage permitted by the 2013 incidental take statement.  The federal defendants previously disputed that formal consultation was necessary,[6] but now concede that reinitiation of formal consultation is required.  However, they argue that plaintiffs' claim is moot, asserting that they have already reinitiated formal consultation and that the court cannot provide plaintiffs with any additional effective relief.  Fed. Oppo. at 12.

---

[6] The federal defendants contend that they have never disputed that formal consultation is necessary.  However, prior to January, 2017, the agencies consistently represented otherwise.  *See, e.g.*, Response to July 18, 2016 Letter Concerning Process for Addressing the Karuk and Yurok Tribes' Sixty-Day Notice of Intent to Sue, Pursuant to the Endangered Species Act: Failure to Reinitiate Consultation on the Klamath Project, AR 418-419 ("The Plan may also be used to inform Reclamation *regarding the need to reinitiate consultation* along with the extent and scope of consultation, *if reinitiated*.") (emphasis added).

### E. Is plaintiffs' reinitiation claim moot?

The federal defendants assert that plaintiffs' claim to order the agencies to reinitiate formal consultation is moot because they have already reinitiated formal consultation. Fed. Oppo. at 11. They contend that formal consultation was reinitiated at some unclear point prior to plaintiffs' filing their lawsuit after NMFS found that the incidental take statements had been exceeded. *Id.* Perhaps acknowledging that their conduct and statements throughout 2016 do not support a conclusion that the agencies reinitiated consultation prior to the filing of plaintiffs' suits,[7] they also point to a letter from January, 2017, in which the Bureau makes clear its desire to reinitiate formal consultation to the NMFS. AR 0001-04; AR 0005-08. This letter appears to be sufficient to show that the defendants have now reinitiated formal consultation.

The federal defendants assert that, because they have reinitiated formal consultation, the court can no longer provide plaintiffs with any effective relief and that the reinitiation claim is moot. They point to various cases in which courts have found reinitiation claims moot following reinitiation of formal consultation. *Alliance for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014) (finding reinitiation claim moot where "the federal defendants ha[d] already completed a second Biological Evaluation consultation addressing the impact of helicopter hazing on Yellowstone grizzly bears."); *Native Fish Soc. v. NMFS*, 992 F. Supp. 2d 1095, 1115-16 (D. Or. 2014) ("NMFS has reinitiated consultation, but plaintiffs contend that the reinitiation was untimely and request declaratory relief. The court concludes that this claim is moot as the court cannot provide plaintiffs with any meaningful relief."); *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1103 (E.D. Wash. 2006) (court could not provide "effective relief" on reinitiation claim where "Defendants are already engaged in consultation.").

In response, plaintiffs argue that their claim is not moot because effective relief may still be granted. They distinguish the cases the defendants cite, noting that in those cases formal

---

[7] The defendants' claim that they reinitiated formal consultation before plaintiffs' suits were filed is contradicted by their own pleadings in this case. For example, in their reply in support of their motion to dismiss the claims brought by Hoopa Valley, the federal defendants argued that they had "been properly discussing on an 'informal basis' reinitiating formal consultation and revising or amending the ITS." Hoopa Dkt. No. 60 at 12. Given their own representations, their new claim that they have been engaged in formal consultation all along is not plausible.

consultation had already been completed or the plaintiffs had not requested any injunctive relief pending completion of formal consultation. *Alliance for the Wild Rockies*, 772 F.3d at 601, 607 (claim was moot where formal consultation had already been completed); *Native Fish Soc'y*, 992 F. Supp. 2d at 1116 (plaintiffs did not request injunctive relief); *Defenders of Wildlife*, 454 F. Supp. 2d at 1103 (court had already granted preliminary injunction, set to expire once formal consultation was complete).

Plaintiffs note that in this case, and in their motion for partial summary judgment, they have requested that the court order the federal defendants to reinitiate formal consultation and have requested an injunction in the form of specific protective flows to be put in place while the agencies complete the consultation process. Yurok Reply at 4 (Dkt. No. 54). They assert that the agencies are currently operating without a valid BiOp and that it will take the federal defendants at least six months to complete consultation and issue a new no-jeopardy finding. *Id.* Because it will take the agencies some time to complete their consultation process, and the flows for the 2017 season will be locked in in April, they contend that an injunction is necessary. *Id.* Plaintiffs argue that their claims are not moot because they can still be provided effective relief in the form of an injunction.

Because plaintiffs do not merely seek declaratory relief ordering the federal agencies to reinitiate consultation, but also seek an injunction until formal consultation is completed, the court may still grant plaintiffs effective relief on their reinitiation claim. The claim is not moot.

**F. Does reinitiation claim fail because 2013 BiOp must be presumed valid?**

Defendants take issue with plaintiffs' assertion that the 2013 BiOp is invalid and that the reinitiation claim remains justiciable because the court may still grant injunctive relief. They contend that the 2013 BiOp must be presumed valid for the purposes of the present motion. Fed. Sur-reply at 3.[8] They assert that an incidental take statement and BiOp are not rendered invalid simply because reinitiation of consultation has begun and that reinitiation of consultation does not require the agencies to issue a new biological report. *Id.*; *Defenders of Wildlife v. Bureau of*

---

[8] Defendants' motion for leave to file a Sur-reply is GRANTED.

*Ocean Energy Mgmt.*, 684 F.3d 1242, 1252 (11th Cir. 2012) ("There is no precedent in our circuit

to support Petitioners' argument that BOEM's choice to reinitiate consultation with NMFS and

FWS automatically renders the former biological opinions invalid."); *Mayo v. Jarvis*, No. 14-cv-

1751, 2016 WL 1254213, at *133 (D.D. C. Mar. 29, 2016) (finding "no authority for [the]

proposition that, whenever the FWS reinstates formal consultation, the consultation must result in

the production of a new, full-blown BiOp.  And they argue that because a BiOp is not

automatically made invalid upon reinitiation of consultation, and because plaintiffs' have not

moved for summary judgment on their substantive claims against the BiOp, the court must

presume that the BiOp is valid.

There are several problems with this argument.  First, the cases the defendants cite seem to

conflict with Ninth Circuit precedent which says that reinitiation of consultation does need to

result in a new Biological Opinion.  *Simpson Timber*, 255 F.3d at 1078 ("Reinitiation of

consultation requires either the FWS or the NMFS to issue a new Biological Opinion before the

agency action may continue."); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th

Cir. 1992) ("Reinitiation of consultation requires the Fish and Wildlife Service to issue a new

Biological Opinion before a project may go forward.").

Further, neither case plaintiffs rely on involved mandatory reinitiation of consultation

following an incidental take violation.  *Defenders of Wildlife*, 684 F.3d at 1252 (Agencies'

voluntary decision to reinitiate consultation to address potential impacts of Deep Water Horizon

disaster did not concede "inadequacy of prior consultations"); *Jarvis*, 2016 WL 1254213, at *132

("NPS reinitiated consultation with the FWS once the incidental take authorized by the 2007 BiOp

was reached, but before it was *exceeded.*") (emphasis in original).  Because the agencies

voluntarily reinitiated consultation in those cases, the decision did not necessarily evidence flaws

in the underlying biological findings or assumptions.

In contrast, in this case, the agencies are mandated to reinitiate consultation because the *C.

shasta* rate in 2014 and 2015 exceeded the incidental take statement.  While a violation of an

incidental take statement does not necessarily mean that the conclusions and no-jeopardy

determination of a BiOp are invalid, in this case, the high infection rates of *C. shasta* in 2014 and

33

2015 directly undermine core conclusions of the NMFS's no-jeopardy determination, which was based on the assumption that *C. shasta* rates would decline over observed POR rates. *C. shasta* rates did not decline--they increased. And they did not just increase a little, they went up to 81 and 91 percent, well over the 49 percent observed historic high and incidental take maximum. NMFS did not study what the impact on Coho salmon would be if *C. shasta* rates increased and did not review the impact that consecutive years with infection rates at 81 and 91 percent would have on the Coho salmon in the long term. To the contrary, its no-jeopardy determination relied on the assumption that *C. shasta* rates would decrease. Because this core presumption has proved incorrect, it is unclear what analysis remains to support the BiOp's no-jeopardy conclusion.

While defendants plausibly argue that a BiOp is not immediately invalidated upon reinitiation of consultation in all instances, they have not convincingly shown that the 2013 BiOp should be presumed valid in this case. While it is true that plaintiffs have not moved for summary judgment on their substantive challenge to the BiOp, this does not mean the court cannot evaluate the BiOp's merit in considering whether injunctive relief on the reinitiation claim is warranted.

### G. Does reinitiation claim fail because it is not narrowly tailored?

Defendants argue that injunctive relief is not an appropriate remedy on a reinitiation claim. Fed. Oppo. at 16. The defendants note that any injunctive relief must be narrowly tailored to the alleged violation. *Id.* They assert that the only appropriate remedy for a failure to reinitiate claim is an order directing the agencies to reinitiate formal consultation, not an injunction. *Id.*

In response, plaintiffs assert that injunctions are an appropriate remedy for substantial procedural violations of the ESA and that courts regularly grant injunctions pending completion of formal consultation. Yurok Reply at 5. They point to *Washington Toxics*, in which the Ninth Circuit stated that "[i]t is well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements." 413 F. 3d at 1034; *see also Pac. Rivers Council v. Thomas*, 30 F. 3d 1050, 1156-57 (9th Cir. 1994) (holding that an injunction to prohibit all logging and roadbuilding that "may affect" listed salmon was necessary while formal consultation was ongoing). They also note that courts have previously issued injunctions on the Klamath Project when reinitiation of formal consultation was ongoing. *See PCFFA I*, 138 F. Supp. 2d at 1250

(ordering an injunction prohibiting water levels to fall below a set minimum during consultation); *PCFFA II*, 426 F.3d at 1095 (directing the district court to issue an injunction requiring minimum flows while formal consultation was completed). Plaintiffs contend that this precedent clearly establishes that an injunction is an appropriate form of relief on a reinitiation claim.

Defendants attempt to distinguish these cases by noting that all the cases plaintiffs cite involved either a failure to consult in the first instance or a proven substantive violation of the ESA. Yurok Fed. Sur-reply at 3 (Dkt. No. 55-1). They argue that because none of those cases involved a stand-alone failure to reinitiate claim, the court should disregard them. *Id.*

While none of the cases plaintiffs point to involve a stand-alone reinitiation claim, this does not mean that they should be ignored. The Ninth Circuit cases lay out a general rule that injunctive relief is an appropriate remedy for a substantial procedural violation of the ESA. *Washington Toxics*, 413 F. 3d at 1034. In *Washington Toxics*, the court stated "The remedy for a substantial procedural violation of the ESA--a violation that is not technical or de minimis--must [] be an injunction of the project pending compliance with the ESA." *Id.*

In *Thomas v. Peterson*, the court explained the rationale for this rule:

> The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result.

753 F.2d 754, 764 (9th Cir. 1985). These cases are, by their own terms, not limited to the failure to complete formal consultation in the first instance but apply to any "substantial procedural violation." If the agencies' failure to reinitiate formal consultation is a "substantive procedural violation" then injunctive relief, while consultation is ongoing, is the appropriate remedy.

The federal defendants' failure to reinitiate formal consultation in a timely manner is a substantial procedural violation. As defendants note, courts have repeatedly found substantive procedural violations where agencies failed to engage in formal consultation in the first instance. *See, e.g.*, *Washington Toxics*, 413 F. 3d at 1029. This is because "[t]he purpose of the consultation process [] is to prevent later substantive violations of the ESA." *Id.* If the federal agencies fail to

United States District Court
Northern District of California

complete the necessary consultation process they cannot ensure that they are in compliance with the substantive provisions of the ESA and run a significant risk of causing substantial substantive harm. *Peterson*, 753 F.2d at 763 ("Without a biological assessment, it cannot be determined whether the proposed project will result in a violation of the ESA's substantive provisions. A failure to prepare a biological assessment for a project in an area in which it has been determined that an endangered species may be present cannot be considered a *de minimis* violation of the ESA.").

Although these cases discuss the failure to consult in the first instance, their analysis is equally applicable here where the federal defendants are required to reinitiate formal consultation because they have substantially exceeded their incidental take trigger and the no-jeopardy conclusion of their 2013 BiOp has been undermined. Just as with the requirement to complete formal consultation initially, the mandate to reinitiate formal consultation in this instance is a procedural requirement designed to "prevent later substantive violations." While the 2013 BiOp provides an assessment of the Klamath Project's impact to Coho salmon, it relies on presumptions that have proven incorrect. The BiOp offers no assessment of the impact to Coho salmon if *C. shasta* rates increase above POR rates or if *C. shasta* rates stay at extremely high levels for two years in a row. Because the BiOp did not address these issues "it cannot be determined whether the proposed project will result in a violation of the ESA's substantive provisions" and cause jeopardy to the Coho salmon. *Peterson*, 753 F.2d at 763.

The BiOp itself acknowledges that the Bureau cannot maintain the status quo after exceeding an incidental take trigger, stating that "[i]n instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation." AR 1075. The Bureau clearly did not cease operations of the Klamath Project following exceedence of the incidental take trigger in 2014. And it did not immediately reinitiate formal consultation, as required by Section 402.16. Instead, it delayed more than two years before reinitiating consultation, continuing to run the project per the 2013 BiOp, resulting in additional alarmingly high *C. shasta* rates. It is not a de minimis violation for defendants to fail to reinitiate formal consultation for two years after the requirement to reinitiate was triggered where that

1   trigger evidenced fundamental flaws in the BiOp's no-jeopardy determination.  The federal

2   defendants' significant delay in reinitiating formal consultation is a substantial procedural

3   violation.  Injunctive relief is appropriate.  *Washington Toxics*, 413 F. 3d at 1034.

**H.  Does Section 7(d) support maintaining the status quo**

5          The federal defendants argue that an injunction is not warranted because "the ESA

6   contemplates action agencies proceeding with actions while consultation is ongoing, even where

7   the action agencies have not previously completed consultation."  Fed. Oppo. at 15.  They cite

8   Section 7(d), which provides that "after initiation of consultation" an agency "shall not make any

9   irreversible or irretrievable commitment of resources" that would foreclose "the formulation or

10  implementation of any reasonable and prudent alternative measures which would not violate

11  subsection (a)(2) . . . ."  16 U.S.C. § 1536(d).  The defendants insist that "[c]ompliance with an

12  existing BiOp does not foreclose development of a reasonable and prudent alternative" and so

13  continuing to run the water project under the 2013 BiOp would not violate Section 7(d).  Fed.

14  Oppo. at 16; *Oceana v. BOEM*, 37 F. Supp. 3d 147, 182 (D.D.C. 2014) (reliance on existing BiOp

15  while reinitiation of consultation was ongoing was reasonable).

16         This is a poor argument.  Section 7(d) generally works to prevent action agencies from

17  continuing with a project prior to completing consultation, not to give projects the go-ahead.

18  *Conner v. Burford*, 848 F.2d 1441, 1455 n.34 (9th Cir. 1988) ("Section 7(d) does not amend

19  section 7(a) to read that a comprehensive biological opinion is not required before the initiation of

20  action so long as there is no irreversible or irretrievable commitment of resources.").  As plaintiffs

21  point out, Congress enacted Section 7(d) in 1978 following the *TVA v. Hill* decision to prevent

22  agencies from funneling resources into a particular project in an effort to create momentum toward

23  its completion.  *North Slope Borough v. Andrus*, 486 F. Supp. 332, 356 (D.D.C. 1979) ("Congress

24  enacted § 7(d) to prevent Federal agencies from 'steamrolling' activity in order to secure

25  completion of the projects regardless of the impacts on endangered species.").  Section 7(d)

26  therefore generally precludes agencies from moving forward with a project when the impact to

27  endangered species has not been made clear.  Although the federal defendants frame Section 7(d)

28  as permitting continued reliance on the 2013 BiOp, Section 7(d) does not offer an agency

United States District Court
Northern District of California

37

affirmative support to continue a project's operations.

Since plaintiffs seek to modify the current operations of an ongoing project, not halt a planned project, Section 7(d) does not readily apply. It is therefore unclear what potential "irretrievable commitment of resources" is at stake. Plaintiffs suggest that failing to implement the proposed injunctive relief could constitute an irretrievable commitment of resources because it could result in lasting and irretrievable damage to the Coho salmon. Yurok Reply at 14. If plaintiffs' argument that the Coho salmon are in a weakened state and face irreparable harm is taken as true, then it is plausible that failing to implement the requested relief could constitute a violation of Section 7(d).

Even though the plaintiffs did not rely on Section 7(d) in their motion for summary judgment, did not bring a formal claim for a Section 7(d) violation, and stated in their reply that "Section 7(d) is irrelevant," the federal defendants still seem convinced that plaintiffs intend to rely on it. In their sur-reply the federal defendants attack any potential reliance on Section 7(d), noting that plaintiffs did not plead this claim or move for summary judgment on a Section 7(d) claim. Fed. Sur-reply at 4. As plaintiffs stated in their reply, it is no surprise that plaintiffs did not bring a Section 7(d) violation in their complaint or in their motion for summary judgment as such a violation can only occur after formal consultation is initiated. The federal defendants did not reinitiate formal consultation until after plaintiffs filed their complaints and moved for summary judgment. Yurok Reply at 14 n.6. Plaintiffs nevertheless assert that Section 7(d) supports injunctive relief as the agencies are obligated to comply with this section regardless of whether plaintiffs have brought a Section 7(d) claim.

Section 7(d) does not support maintaining the status quo: at a minimum it is neutral toward the proposed injunction and at a maximum it supports the proposed protective flow measures.

### I.  Does reinitiation claim fail because plaintiffs' have failed to show causation?

The intervenor defendants argue that plaintiffs have failed to prove that reinitiation is necessary because they have not shown that the Klamath Project caused "each and every incidence of infection of a juvenile Chinook salmon" in the Klamath river. Int. Oppo. at 10. They note that establishing a "take" requires a showing of actual and proximate cause and submit that plaintiffs'

38

cannot show that the Klamath Project operations caused all incidences of *C. shasta* infection.  *Id.*

It is not necessary for plaintiffs' to show that each and every incidence of *C. shasta* is the result of the Klamath Project.  The 2013 BiOp sets the permissible rates of *C. shasta* among Chinook and Coho salmon and notes, in accordance with 50 C.F.R. § 402.16, that reinitiation of formal consultation is required if this take amount is exceeded.  As there is no dispute that the incidental take statement was exceeded, reinitiation of formal consultation is required.

## II.  INJUNCTIVE RELIEF

Claims for injunctive relief are generally governed by a four-factor test: (1) there will be irreparable harm; (2) there are no adequate remedies at law; (3) a balance of hardships supports the requested relief; and (4) the relief is within the public interest.  *Indep. Training & Apprenticeship Program v. Calif. Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013).  Plaintiffs contend that they have met this test because they have demonstrated that, absent the requested relief, Coho salmon and plaintiffs will suffer irreparable harm; monetary damages are inadequate to compensate for the loss of endangered species; and the ESA requires courts to prioritize endangered species over other interests.  Yurok Reply at 5.  The defendants respond that plaintiffs have failed to demonstrate that injunctive relief is appropriate for several reasons.

### A.  Irreparable Harm

First, the federal defendants contend that plaintiffs have failed to show irreparable harm to themselves.  However, all plaintiffs have demonstrated that irreparable harm to Coho salmon would cause them personal harm as well.  The Yurok Tribe has demonstrated that the Yurok people's lives are inextricably linked to salmon and that they rely on salmon for their subsistence, cultural identity, rituals, and economic well-being.  O'Rourke Decl. at 26-27 (Yurok Dkt. No. 47). The Hoopa Valley Tribe has demonstrated a similar interest.  Hoopa Mot. at 1, (Hoopa Dkt. No. 69-1).  The fishing associations have shown that they are harmed when salmon abundance drops because the potential salmon harvests decrease.  They note that many of their members are subsistence fishers, relying on the salmon for their living, and that harvests have been particularly low in recent years as *C. shasta* infection rates have remained high.  Spain Decl. ¶¶ 13-14 (Yurok Dkt. No. 15); Fisher Decl. (Yurok Dkt. No. 12).  These interests are all sufficient to show that that

1   the plaintiffs will suffer personal harm if the Coho are irreparably harmed.

2       Next, the defendants assert that plaintiffs have failed to show that the Coho salmon will be

3   irreparably harmed absent the requested relief.  The federal defendants argue that plaintiffs have

4   failed to show harm to Coho salmon at a species level.  Fed. Oppo. at 18.  They also contend that

5   because it does not appear that 2017 will be a drought year, it is unlikely that the high rates of *C.*

6   *shasta* seen in 2014 and 2015 will return.  Fed. Oppo. at 19.  The intervenor defendants also

7   submit that plaintiffs have failed to show irreparable harm because many factors contribute to

8   disease rates among Coho salmon and plaintiffs seek to enjoin the Bureau to take affirmative

9   action to prevent infection for any reason, rather than just to prevent infection that may be caused

10  by the Klamath Project itself.

### 1.   Species-Level harm

12      Plaintiffs note that it is not necessary to show harm to the "species as a whole" to obtain an

13  injunction.  *Big Country Foods, Inc. v. Bd. of Educ.*, 868 F.2d 1085, 1088 (9th Cir. 1989)

14  (plaintiffs must show irreparable injury "irrespective of the magnitude of the injury"); *Nat'l*

15  *Wildlife Fed. v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) ("We are not saying

16  that a threat of extinction to the species is required before an injunction may issue under the ESA.

17  This would be contrary to the spirit of the statute, whose goal of preserving threatened and

18  endangered species can be achieved through incremental steps."); *Marbles Murrelet v. Pac.*

19  *Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996) ("A reasonably certain threat of imminent harm

20  to a protected species is sufficient for issuance of an injunction.").  Evidence that the Coho salmon

21  will suffer imminent harm of any magnitude is sufficient to warrant injunctive relief.

### 2.   Water levels for 2017 appear favorable

23      The defendants contend that *C. shasta* reached high levels in 2014 and 2015 because there

24  were unprecedented droughts in those years, making water levels particularly low.  Fed. Oppo. at

25  19.  They note that 2016 water levels were significantly better and *C. shasta* rates were only 48

26  percent, below the maximum outlined by the 2013 Incidental Take Statement.  *Id.*  They contend

27  that 2017 water levels are similarly promising and that the water conditions and disease rates seen

28  in 2014 and 2015 are therefore unlikely to return, even if the Bureau continues to run the Klamath

United States District Court
Northern District of California

Project pursuant to the 2013 BiOp.  *Id.*  They also note that higher water levels make it more likely that the Bureau will be able to take disease management steps, which the 2013 BiOp provides for when water is available.  *Id.*

Plaintiffs acknowledge that water levels improved in 2016 and that the projections for 2017 also appear favorable.  Yurok Reply at 6.  However, they argue that the Coho salmon are still at significant risk.  First, they note that the 2013 BiOp's no-jeopardy determination relied on the assumption that *C. shasta* rates for Coho salmon would fall under the 2013-2023 operations and would never exceed 49 percent.  *Id.*  Next they highlight that the BiOp recognized that *C. shasta* was the most significant risk for Coho salmon and that the Klamath Project increases the risk of disease above natural conditions.  *Id.*  Plaintiffs argue that the record high levels of *C. shasta* in 2014 and 2015 demonstrate that NMFS's assumptions about the Klamath Project's impact on Coho salmon were fundamentally flawed as disease rates did not decrease, but instead markedly increased under the 2013 plan.  *Id.*  They note that the 2013 BiOp did not assess the impact that multiple years of infection rates at or near the incidental take maximum might have on Coho salmon.  *Id.* at 7.  The 2013 BiOp did not address this issue because it concluded that *C. shasta* rates would decline from observed POR rates, which averaged around 30 percent and had never exceeded 49 percent, and so presumed that Coho salmon would not be subjected to these conditions.  Plaintiffs argue that, given this presumption, there is nothing in the 2013 BiOp to support the idea that Coho salmon can sustain multiple years of infection at or near the 49 percent infection rate.  *Id.*

Plaintiffs also argue that the extreme infection rates seen in 2014 and 2015 have weakened the Coho salmon population's abundance, fitness, and resilience such that protective measures are particularly important now.  Again, because the 2013 BiOp presumed that *C. shasta* rates would fall, it did not address the potential lasting impact that consecutive years of infection, well above the incidental take maximum, might have on the Coho salmon.  But plaintiffs assert the extreme infection rates seen in 2014 and 2015 will impact the offspring generations of the affected juvenile Coho salmon.  For example, they explain that because Coho salmon have a three-year life cycle, the offspring of the juvenile salmon affected in 2014 will be outmigrating in 2017.  Yurok Reply

United States District Court
Northern District of California

at 7.  They argue that, because the 2017 population has been stressed and weakened by the high infection rates seen in its parents' generation, they may be less able to sustain additional years of high *C. shasta* infection and protective flows are particularly important.  *Id.*

Plaintiffs respond to the Bureau's argument that higher water years will allow the Bureau to take more protective steps in 2017 in accordance with the 2013 BiOp by noting that the Bureau's history of operating under the 2013 BiOp has not been favorable to the salmon, even in non-drought years.  *Id.* at 9.  They point out that in 2013 and 2016 infection rates approached the Incidental Take maximum, 46 percent and 48 percent respectively, even though these were close to average water years.  *Id.* at 10.  They also note that the Bureau only provides flushing and dilution flows, in line with the disease management program, if there is water available after water is allocated to irrigation.  *Id.*  While the 2013 BiOp is sufficiently flexible that the Bureau could theoretically operate the Klamath Project in a manner favorable to the Coho salmon in 2017, prior years show that if water is limited, it is unlikely to issue flows above the BiOp's mandated minimums.  Plaintiffs have demonstrated a likelihood of immediate irreparable harm even though the projected water levels for 2017 are favorable.

### 3.  Disease rates are not all attributable to the Klamath Project

The intervenor defendants contend that plaintiffs have failed to show irreparable injury because Coho salmon survival depends on many factors, not just the operations of the Klamath Project.  Int. Oppo. at 20.  They point to the declaration of Mr. Cramer, who explains that factors such as weather conditions and environmental variation primarily account for changes in infection rates and that "[a]ny assumption that operations of the Klamath Project is the cause of a given incidence of *C. shasta* infections of salmonids in the Klamath River between the Shasta River and Trinity River, or of increases between years in the rate of infections, is not supported by the available data."  Cramer Decl. ¶ 9 (Yurok Dkt. No. 48-2).  Cramer concludes "that continued operation of the Klamath Project consistent with the 2013 BiOp would not result in irreparable harm to the species."  *Id.*

These arguments are not persuasive.  No doubt many factors beyond the Klamath Project's operations, impact *C. shasta* disease rates, but there is no dispute, and the 2013 BiOp concedes,

that the Klamath Project's operations increase the incidence of *C. shasta* above natural levels.  AR 1011.  It is not necessary for plaintiffs to show that the Klamath Project causes all incidences of *C. shasta*, only that the Coho salmon are likely to be irreparably harmed absent the requested relief.  While environmental variability may be the primary cause of *C. shasta* fluctuations, plaintiffs cannot obtain injunctive relief from Mother Nature.  It is the Bureau's responsibility and obligation to ensure that its actions do not jeopardize the Coho salmon, after taking factors outside its control, such as environmental variability, into account.  16 U.S.C. § 1536(a)(2).

It is not necessary for plaintiffs to show that there is likely to be irreparable harm to the species as a whole or a risk of extinction.  *Nat'l Wildlife Fed.*, 23 F.3d at 1512 n.8 ("We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA.  This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can be achieved through incremental steps.").  Plaintiffs have presented compelling evidence that the Coho salmon are in a precarious state following years of high *C. shasta* rates and that the Bureau is unlikely to put protective flows into place absent an injunction.  They have shown that without protective flows the Coho salmon are likely to face another year of *C. shasta* infection above or near the maximum incidental take rate and that such infection rates could further diminish the salmon's resilience, abundance, and health.  They have shown that the Bureau locks in its irrigation diversions in April and that, once these rates are locked in, the Bureau will only be able to provide flushing flows and dilution flows if water conditions allow it.  Plaintiffs have presented sufficient evidence to show that, absent an injunction, the use of protective flows will be left to chance.  And they have shown that without these flows, the Coho salmon are likely to face high rates of *C. shasta* that will weaken an already weakened population.  Plaintiffs have presented sufficient evidence to show that they will face irreparable harm absent an injunction.

### B.  No adequate remedy at law

There is no adequate remedy at law for the loss of or harm to endangered species.  *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) ("Congress established an unparalleled public interest in the 'incalculable' value of preserving endangered

United States District Court
Northern District of California

United States District Court
Northern District of California

species.  It is the incalculability of the injury that renders the remedies available at law, such as

monetary damages inadequate.") (citations and quotations omitted).  There is no dispute that the

potential harm to the Coho salmon is one for which there is no adequate remedy at law.

**C.   Balance of harms and public interest**

The defendants assert that the balance of harms weighs against an injunction because (1)

plaintiffs' proposed injunctive relief could harm sucker fish that live in the Upper Klamath Lake,

and (2) the court should take into account the real financial interests of farmers and businesses that

rely on irrigation water for their business and livelihoods.

In ESA cases "the balance of hardships and the public interest tip heavily in favor of

endangered species."  *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987).  Defendants

acknowledge that this would generally favor granting injunctive relief to protect endangered

species, such as the Coho salmon, but argue that the calculus is different in this case because the

proposed injunctive relief might harm endangered sucker fish that live in the Upper Klamath Lake.

Fed. Oppo. at 21.  Two species of sucker fish live in the Upper Klamath Lake and rely on certain

water levels for their habitat and survival.  *Id.*  When additional water is sent downstream, for

example, to be used as protective flows for Coho salmon, the available water in the Klamath Lake

decreases as does the sucker habitat.  *Id.*  Defendants argue that the balance of harms does not

weigh in favor of granting plaintiffs' relief because the additional water requested would be taken

away from the sucker fish and the court cannot show a preference for the threatened Coho salmon

over the endangered sucker fish.

Plaintiffs respond that this argument is a red herring because their proposed injunction

would not alter the mandatory minimum lake levels for the Upper Klamath Lake.  Yurok Reply at

11.  They agree that sucker fish are entitled to protection, just like the Coho salmon, and argue that

their proposed injunction would prioritize both Coho salmon and suckers over water diverted to

the irrigation districts, as mandated by the ESA.  *Klamath Water Users Protective Ass'n v.

Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999) ("[T]he Irrigators' rights to water are subservient

to the ESA.").  Plaintiffs assert that both the Coho salmon and suckers' water needs can be met by

withholding water that would otherwise be sent to the irrigation districts and using it to complete

1    the protective flows they request.  Plaintiffs' technical analyst, Michael Belchick, submits that

2    there are many ways the proposed protective flows could be implemented without impacting the

3    Klamath Lake minimum levels, such as "reducing agricultural water deliveries, using PacifiCorp's

4    reservoirs, groundwater pumping, or making deliveries of water from east side sources (Clear

5    Lake and Gerber Reservoir) as delivered down the Lost River and the Lost River Diversion

6    Channel."  Belchick Decl. ¶ 15 (Yurok Dkt. No. 54-2).

7         In their sur-reply, the federal defendants assert that this is not a simple matter of diverting

8    water away from the irrigation districts because the proposed flows would largely take place in the

9    winter and spring when deliveries to irrigation are low.  Bottcher Decl. ¶ 9 (Yurok Dkt. No. 47-2).

10   They point to the declaration of Jared Bottcher, which notes that the Klamath Lake has only

11   420,000 acre-feet of usable storage and that plaintiffs' proposed measures would require 50,000 –

12   320,000 acre-feet of water, severely disrupting the water levels at Klamath Lake.  *Id.*  Bottcher

13   also notes that there are other bodies of water within the Klamath Project system that contain

14   sucker fish and would be impacted by changes to the water flows.  Incidental take at the Lake

15   River Dam for suckers is measured by comparing the density of fish to the volume of water

16   passing the Link River Dam, meaning that if water levels at the Link River Dam measurably

17   increase the incidental take rate will increase (as the fish will represent a lower percentage of total

18   water, even if there is no actual decrease in fish abundance).  *Id.* ¶ 11.  Bottcher also notes that the

19   Bureau is required to maintain particular water levels at Tule Lake but that no specific amount of

20   water is earmarked for Tule Lake because it has historically received sufficient water from

21   irrigation runoff and drainage.  *Id.* ¶ 12.  He notes that if irrigation deliveries decrease, the Tule

22   Lake levels will decrease as well.

23        The defendants' arguments highlight that the Klamath Project is a complex system.  It is

24   unsurprising that any changes to water flows will have additional impacts elsewhere.  Plaintiffs

25   maintain that there are various management options that the Bureau can use to implement the

26   injunctive flows while complying with its other obligations.  To the extent that plaintiffs'

27   requested relief would require reducing water levels below the minimums set for the suckers, they

28   are not permitted.  Because it appears that, with collaboration, the Bureau could implement at least

United States District Court
Northern District of California

45

1   some of the plaintiffs' proposed injunctive measures, I do not conclude that the hypothetical

2   impact to the suckers precludes injunctive relief.

3       Next, the intervenor defendants submit that their interests should be taken into account,

4   noting that the proposed injunction might reduce the water available to irrigators and "would

5   create significant hardships for the community of farmers and ranchers that rely on water from the

6   Klamath Project for their livelihoods." Int. Oppo. at 21. The intervenor defendants undeniably

7   have genuine and important interests, and the court recognizes that the proposed measures might

8   cause hardship to the farmers, ranchers, and their communities. However, as plaintiffs point out,

9   courts are not permitted to favor economic interests over potential harm to endangered species.

10  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in

11  enacting this statute was to halt and reverse the trend toward extinction whatever the cost.").

12  Congress has established that endangered species must be prioritized and "courts may not use

13  equity's scales to strike a different balance." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

14  422 F.3d 782, 793 (9th Cir. 2005); *Cottonwood*, 789 F.3d at 1091 ("[T]he equities and public

15  interest factors always tip in favor of the protected species.").

16      The requested injunctive relief would also help protect the Tribes' fishing rights, which

17  must be accorded precedence over irrigation rights. The Hoopa Valley and Yurok Tribes have

18  federally reserved fishing rights. *Parravano v. Masten*, 70 F.3d 539, 541 (9th Cir. 1995) (holding

19  that "executive orders issued in 1876 and 1891 vested the Hoopa Valley and Yurok [] with

20  federally reserved fishing rights" and that the Tribes still retained these rights); *Patterson*, 204

21  F.3d at 1214 ("We have held that water rights for the Klamath Basin Tribes carry a priority date of

22  time immemorial."). Because the Bureau operates the Klamath Project, "it has a responsibility to

23  divert the water and resources needed to fulfill the Tribes' rights, rights that take precedence over

24  any alleged rights of the Irrigators." *Patterson*, 204 F.3d at 1214. Because the requested relief

25  would protect the Tribes' fishing rights, which hold a priority over the irrigator rights, the balance

26  of harms and public interest also favor the proposed injunction.

27  **III.  IS THE PARTICULAR INJUNCTIVE RELIEF REQUESTED WARRANTED?**

28      Plaintiffs request two primary forms of flows to reduce *C. shasta* infection rates: (1)

46

flushing flows in the winter and spring to reduce polychaete worm concentrations; and (2) dilution

flows when *C. shasta* rates spike. Yurok Mot. at 20. Plaintiffs assert that these proposed

measures are supported by the best available science and are necessary to reduce *C. shasta* rates

among the Coho salmon and prevent irreparable harm. *Id.* Plaintiffs proposed measures come

from the Guidance Document, a document prepared by plaintiffs' technical analysts by relying on

the findings of the 2013 BiOp and the four tech memos provided by FWS. AR 231-232. While

the Guidance Document proposes additional protective measures, plaintiffs assert that the

prevention and emergency dilution flows are the most urgent and only seek to enjoin the Bureau to

provide these flows. Yurok Mot. at 20.

### A. Protective Flushing Flows

Plaintiffs' first request is for prevention flows in winter and spring to flush out the

polychaete worms that host *C. shasta* spores. *Id.* at 21; AR 237. Plaintiffs note that *C. shasta* is

not transmitted from salmon to salmon, and that the Coho salmon contract *C. shasta* from the

polychaete worms. Yurok Mot. at 21. Peak flows with elevated water velocities can dislodge the

host worms from the riverbed and flush them downstream. AR 237. Plaintiffs propose both

surface flushing flows and deep flushing flows. Yurok Mot. at 21.

Plaintiffs note that surface flushing flows occurred regularly in years considered by the

biological opinion but have become less common in recent years. AR 237-238. As the

sedimentation tech memo states, "From 1964 to 1999, the average cumulative duration of Surface

Flushing flows exceeded 22 days per water year. From 2000 to 2016, the average cumulative

duration of Surface Flushing flow exceeded five days in only one water year and no sediment

mobilization flows occurred in 12 of the 17 water years." AR 269.

While the 2013 BiOp recognized the importance of flushing flows for reducing spore

concentration, it also conceded that the spring minimum flows would not be sufficient to dilute

high *C. shasta* concentrations. AR 1007-1008. Plaintiffs argue that there is a scientific consensus

that flushing flows reduce *C. shasta* infection rates among Coho salmon, and that these flows have

become increasingly infrequent in recent years. Although the historical evidence does not show

that flushing flows regularly occurred on an annual basis, plaintiffs propose implementing winter-

United States District Court
Northern District of California

United States District Court
Northern District of California

1  spring flushing flows every year for the duration of the 2013 BiOp or until dam removal is

2  completed because of the Coho's weakened state.  Yurok Mot. at 22.

3      Plaintiffs also propose deep flushing flows.  AR 239.  Deep flushing flows are similar to

4  flushing flows but involve larger volumes of water, which results in more sediment disturbance

5  and can dislodge polychaete worms to a greater degree than flushing flows alone.  *Id.*  The

6  biological opinion recognized that deep flushing flows are likely to "reduce polychaete abundance

7  and disturb their fine sediment habitat."  AR 1009-1011.  However, it did not mandate such flows.

8  Plaintiffs propose deep flushing flows only in years where there is water available.  Yurok Mot. at

9  23.

10      Plaintiffs ask that surface flushing flows be provided, at a minimum, and that deep flushing

11  flows be provided when water levels permit it.  *Id.*  Although they request these general types of

12  flows, they contend that the "timing of such releases should be left to the Bureau's discretion to

13  enable the Bureau to take advantage of flows and to address safety concerns."  *Id.*  They also

14  request that the court "direct the parties to have their technical experts confer and propose a

15  detailed order addressing timing, duration, and operations considerations for the particular

16  flushing flows."  *Id.*

17  **B. Emergency Dilution Flows**

18      Plaintiffs' second proposed form of relief is for emergency flows when *C. shasta* rates

19  spike.  *Id.*  They request pulse flows to dilute spore concentrations when *C. shasta* rates are

20  particularly high.  *Id.*  Plaintiffs assert that their proposed emergency dilution flows mirror the

21  2013 BiOp's disease management plan with two exceptions: (1) the disease management plan only

22  triggers emergency flows when *C. shasta* rates reach 49 percent; and (2) emergency flows are only

23  implemented if surplus water is available.  *Id.*

24      In lieu of the 49 percent infection rate trigger, plaintiffs assert that emergency flows should

25  be triggered when infection rates approach the historic average of 30 percent.  *Id.* at 24.  They

26  reasonably contend that a 49 percent trigger is insufficient to prevent infection rates above the

27  incidental take maximum (49 percent) because infection rates are likely to exceed this amount

28  before the emergency flows take effect.  *Id.*  A 30 percent trigger would certainly provide more

time for emergency measures to take effect.  While it is unclear whether a slightly higher trigger might work equally well, the technical experts can debate the merits of a specific triggering infection rate.

Next, plaintiffs argue that the 2013 BiOp's requirement that emergency flows be used only in years when surplus water happens to be available is insufficient.  To ensure that water will be available if emergency flows become necessary, they "ask the Court to require the Bureau either to reserve a sufficient amount of water for emergency dilution flows or to condition the irrigation allocation so that emergency dilution flows will occur if conditions warrant."  *Id.* at 24.

As with the flushing flows, plaintiffs ask that the court direct the technical experts for the parties to propose a detailed plan setting out the precise triggers, volumes, timing, and duration of emergency dilution flows.  *Id.*

## C. Defendants' Objections to the Proposed Injunction

The defendants object to plaintiffs' proposed injunctive relief because it has not been properly tested through a comprehensive scientific process.  Int. Oppo. at 13-14.  They emphasize that the likely impact of plaintiffs' proposed relief is to deprive the irrigators of thousands of acre-feet of water, which will cause substantial financial hardship.  *Id.* at 15.  They assert that, because the need for plaintiffs' proposed measures is uncertain but the harm to the irrigators is clear, injunctive relief is not appropriate.

Defendants note that plaintiffs' proposed injunctive measures come from the Guidance Document, a report prepared by plaintiffs' technical experts that draws from the 2013 BiOp and the FWS tech memos.  *Id.* at 14.  Defendants emphasize that the Guidance Document was not prepared in line with the plan set out by DTAT.  They also note that the federal agencies have raised a number of concerns with the Guidance Document recommendations.  *Id.*  For example, the FWS questioned why the flushing flows would be implemented annually when historical conditions show that these flows only regularly occur every two years.  AR 51.  FWS also commented that the Guidance Document should provide additional justification for the "deep flushing flows" and how these flows would impact the overall ecosystem, noting that the measures may "create unforeseen difficulties for the very species we are trying to protect."  AR 52.  With

1    regard to the recommendation to hold 50,000 acre-feet of water in reserve, the FWS commented,

2    "There is little evidence in the tech memos to support the need or effectiveness of this action."

3    AR 53.

4         Plaintiffs respond to these criticisms by noting that their proposed injunctive relief is based

5    on the "best available science." Yurok Reply at 15.  They contend that these proposals are based

6    on the conclusions and findings in the 2013 BiOp and the FWS tech memos, which themselves

7    were developed through a detailed scientific process.  *Id.*  The 2013 BiOp concluded that *C. shasta*

8    rates pose a significant threat to Coho salmon and acknowledged that flushing flows can be

9    effective at diluting polychaete densities and reducing *C. shasta* infection rates.  *Id.*; AR 1006-

10   1011.  The FWS memos compile the best available science on *C. shasta* life history, infection

11   rates, and the effect of flushing and dilution flows.  Yurok Reply at 16.  The DTAT members and

12   other *C. shasta* experts provided comments on the FWS memos and the memos were peer

13   reviewed.  *Id.*

14        Plaintiffs note that, although all the members of DTAT were originally going to work

15   together to prepare the Guidance Document, the federal defendants decided not to participate

16   because the Bureau would be implementing the recommendations and NMFS would be reviewing

17   the recommendations.  *Id.*  Following this change in plan, the plaintiffs moved forward with

18   preparing the Guidance Document and sought feedback and comments from the agencies.  *Id.*

19   Plaintiffs' technical experts used this feedback and these comments to update and hone the

20   Guidance Document and prepared a detailed matrix documenting the comments from all of the

21   DTAT members and reviewing agencies, and plaintiffs' experts' responses to each comment.

22   Supp. Belchik Decl. ¶¶ 8-12 (Yurok Dkt. No. 54-2); Supp. Belchik Decl. Ex. 1 (Yurok Dkt. No.

23   54-3).   Plaintiffs have convincingly shown that their proposed injunctive flows are based on the

24   best available science and incorporate comments and feedback from experts in the field.

25        Plaintiffs have demonstrated that flushing flows and emergency dilution flows would

26   reduce *C. shasta* rates among Coho salmon.  There is no meaningful dispute among the parties on

27   this point.  The more substantive disputes involve whether the Bureau can practically implement

28   plaintiffs' proposed relief and remain in compliance with its many other obligations – for example,

United States District Court
Northern District of California

whether it can provide the requested flows without violating the minimum Klamath Lake levels
required for sucker fish.  These concerns must be addressed by having the technical experts confer
on the details of how particular flows should be implemented.

### D.  Whether an Evidentiary Hearing is Required

Defendants finally argue that the proposed injunctive relief is not appropriate because there
are factual disputes that must be resolved before injunctive relief is granted.  Int. Oppo. at 21.
Defendants assert that there are disputed facts on various issues, including whether the proposed
injunction is necessary to prevent irreparable harm to the Coho salmon and whether the requested
injunction would cause harm to other endangered species.  *Id.* at 22.  Defendants request either an
evidentiary hearing or discovery to determine whether any relief is necessary, and to test the
accuracy of the proposed injunctive measures.  *Id.*

Plaintiffs respond that there are no material factual disputes that would preclude the
requested relief.  Yurok Reply at 19; *see Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th
Cir. 1988) (an evidentiary hearing is only necessary if there are material facts in dispute).
Plaintiffs assert that none of the factual disputes identified by the defendants are relevant to
assessing whether injunctive relief should be granted.  Yurok Reply at 19.  They assert that any
potential harm to irrigators or wildlife refuges is legally irrelevant as the court must prioritize ESA
rights over these interests.  *Id.*  Similarly, they respond to the defendants' assertion that there are
many factors that contribute to *C. shasta* rates, beyond the operations of the Klamath Project, by
noting that these potential factors are irrelevant to whether an injunction against the Klamath
Project is warranted.  *Id.*  Environmental variation does not obviate the Bureau's Section 7(a)
obligations.  Plaintiffs seek to enjoin the Klamath Project, which is subject to human control, not
unmanageable environmental factors.  These "factual disputes" do not necessitate an evidentiary
hearing.

Plaintiffs respond to the critiques of the science behind the Guidance Document by noting
that the ESA instructs parties to implement the best available science, but does not require perfect
information or the best science possible.  *Id.*; *see Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d
671, 680 (9th Cir. 2016) (ESA requires action based on the best available science and does not

United States District Court
Northern District of California

require parties to wait for underlying research to be ironclad and absolute); *San Luis & Delta-Mendota Water Auth.*, 747 F.3d 581, 602 (9th Cir. 2014) ("[W]here the information is not readily available, we cannot insist on perfection: [T]he best scientific . . . data *available*, does not mean the best scientific data *possible*.").

Although the proposed injunctive measures have not been exhaustively tested, plaintiffs have made a compelling case that these measures are based on the best available science and that there are no material disputes as to their ability to reduce *C. shasta* rates.  Although the defendants raise some potential issues with implementing the precise measures requested, plaintiffs have suggested that the parties work together to prepare a proposed flow plan that would address the various complicated concerns.  The only alternative to imposing the proposed measures is to wait until more concrete measures can be developed.  Where plaintiffs have shown a threat of imminent harm to the Coho salmon, waiting for perfect science is not appropriate.  An evidentiary hearing is not necessary and would further delay necessary relief.

**E.  Relief**

Plaintiffs' requested flows are supported by the best available science and are likely to reduce *C. shasta* rates.  Given the complexity of the Klamath Project and the potential harm to endangered sucker fish, the parties must work together to determine an appropriate flow plan.  The plaintiffs' technical experts and the agency experts shall meet and confer on the precise timing, duration, and volume of any flows and submit a proposed injunctive flow plan by March 9, 2017.

**CONCLUSION**

The federal defendants' motion to dismiss the Hoopa Valley claims is GRANTED with regard to Count III against NMFS and is DENIED with regard to all other Claims.

The intervenor-defendants' motion to join the federal defendants' motion to strike or limit review is GRANTED, however, the motion to strike or limit review is DENIED.

The federal defendants' motion for leave to file a Sur-reply is GRANTED.

The plaintiffs' motion for summary judgment on their reinitiation claims is GRANTED. The federal defendants violated Section 402.16 by failing to reinitiate consultation after the incidental take trigger for *C. shasta* was exceeded in 2014.  Plaintiffs are entitled to injunctive

United States District Court
Northern District of California

relief on this substantial procedural violation.  Plaintiffs' requested flows are supported by the best available science and are likely to reduce *C. shasta* rates.  Given the complexity of the Klamath Project, and the potential harm to endangered sucker fish, the parties' technical experts will need to determine the precise details of a preliminary injunctive flow plan.

Accordingly, the Court enters the following preliminary injunction:

1.     Until such time as the formal consultation, recently initiated by the federal defendants, is completed, the Bureau is ordered to require two types of flows: (1) winter-spring flushing flows designed to dislodge and flush out polychaete worms that host *C. shasta* and (2) emergency dilution flows.  Emergency dilution flows are required between April and June 15 only if *C. shasta* infection rates exceed 30 percent, or such other rate as agreed by the experts.

2.     The technical experts for the parties will confer and submit to the Court on or before March 9, 2017, a proposed order fleshing out the parameters of the required mitigation measures in accordance with the best available science.  In no event shall the proposed mitigation measures interfere with conditions necessary to protect the endangered sucker fish.  The Court expects that the technical experts will propose surface flushing flows, at a minimum, and deep flushing flows if there is sufficient water, modeled on management guidance 1 and 2 in the Guidance Document prepared by the Tribes.  The Court also expects the parties will propose a plan for instituting emergency flows, modeled on management guidance 4.  If that is not the proposal, the experts shall explain why what they propose is more effective.  The timing of the releases of water is left to the Bureau's discretion.

3.     In all other respects, the 2013 BiOp and take statement remain in effect pending completion of the reinitiated formal consultation.

4.     No bond or security is required.

**IT IS SO ORDERED**.

Dated: February 8, 2017

WILLIAM H. ORRICK
United States District Judge