UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HOOPA VALLEY TRIBE, | Case No. 3:16-cv-04294-WHO |
| Plaintiff, | **ORDER MODIFYING FEBRUARY 8, 2017 INJUNCTION** |
| v. | |
| U.S. BUREAU OF RECLAMATION, et al., | |
| Defendants, | |
| and | |
| KLAMATH WATER USERS ASSOCIATION, et al., | |
| Defendant-Intervenors. | |

For the reasons stated in the Court's February 8, 2017 Order (Dckt. No. 102), the Court hereby enters the following injunction,[1] modifying page 53, lines 5-22, of that Order:

1. Until such time as the formal consultation, recently initiated by the federal defendants, is completed, the Bureau is ordered to require two types of flows: (1) winter-spring flushing flows modeled on Management Guidance 1 and 2 designed to dislodge and flush out polychaete worms that host *Ceratanova shasta* (*C. shasta*) and (2) emergency dilution flows modeled on Management Guidance 4, in *Measures to Reduce Ceratanova Shasta Infection of Klamath River Salmonids: A Guidance Document* (Jan. 17, 2017) ("Guidance Document") (Dckt. No. 96-4). The parameters of these required flows are

---

[1] This Order does not prescribe the U.S. Bureau of Reclamation's ("Bureau") proposed action or the National Marine Fisheries Service's ("NMFS") jeopardy determination or incidental take statement for the reinitiated Endangered Species Act ("ESA") consultation for the operation of the Klamath Project.

described below.  Subject to the timeframes described in Management Guidance ##1, 2, and 4, the timing of the releases of water is left to the Bureau's discretion.

2. In all other respects, the 2013 Biological Opinion on Klamath Project Operations ("2013 BiOp") and incidental take statement remain in effect pending completion of the reinitiated formal consultation.

3. In no event shall the mitigation measures interfere with conditions necessary to protect the endangered sucker fish.

I.     **Winter-Spring Surface Flushing Flows and Deep Flushing Flows**

a.     **2017**

4. As of the date of this injunction, the Parties[2] have agreed that surface flushing flows consistent with Management Guidance #1 and that the spirit and intent, although not the specific desired magnitude, of deep flushing flows modeled on Management Guidance #2 were met twice during February 2017 flow events.

5. If sufficient hydrologic conditions exist, and increased downstream flows would not interfere with the conditions necessary to protect endangered Lost River and shortnose suckers or negatively impact water available for the implementation of emergency dilution flows, the Bureau shall make another attempt to implement a deep flushing flow modeled on Management Guidance #2 within the inherent infrastructure limitations and public safety constraints (*e.g.*, Link River Dam release capacity, flooding concerns, etc.).

---

[2] For purposes of this Order, the term "Parties" refers to the parties in both this case and the companion case, No. 16-4294-WHO, and specifically includes:  Plaintiffs Yurok Tribe, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and Klamath Riverkeeper in this case and Plaintiff Hoopa Valley Tribe in the companion case; Federal Defendants U.S. Bureau of Reclamation and National Marine Fisheries Service; and Defendant-Intervenors Klamath Water Users Association, Sunnyside Irrigation District, Ben DuVal, Klamath Drainage District, Klamath Irrigation District, and Pine Grove Irrigation District.

     **b.**     **Subsequent Years**

6. Until the reinitiated formal consultation is complete, the Bureau shall release surface flushing flows modeled on Management Guidance #1 in every year.

7. Until the reinitiated formal consultation is complete, the Bureau shall release deep flushing flows modeled on Management Guidance #2 in at least every other year (beginning in 2017) unless the Bureau determines that such flows are limited and/or precluded by inherent hydrologic, infrastructure, and/or public safety constraints.

8. Subject to the timeframes described in Management Guidance #1 and Management Guidance #2, the timing of any such releases of water is left to the Bureau's discretion; however, the Bureau shall coordinate with the Parties regarding the timing and magnitude of these flows. Notwithstanding the Bureau's coordination with the Parties, the Bureau shall retain ultimate decision making authority as the action agency, subject to the requirements of paragraphs 6 and 7 of this Order.

9. When surface and deep flushing flow releases occur after March 1, the Bureau shall account for such volume of water that is above and beyond what would have otherwise been released under the 2013 BiOp formulaic distribution in a manner that is not attributed towards the Environmental Water Account ("EWA"). When surface and deep flushing flow releases occur prior to March 1, the Bureau shall account for such volume of water that is above and beyond releases that would have occurred under the 2013 BiOp in a manner that does not affect the calculations determining the volume of the EWA on March 1.

**II.**    **Emergency Dilution Flows**

10. Until such time that reinitiated formal consultation is complete, the Bureau shall release emergency dilution flows modeled on Management Guidance #4 as follows:

      **a.**     **Establishment of Reserve Water Supply**

11. The Bureau shall set water operations and water supply allocations for Upper Klamath Lake, the EWA, and the Project Supply as defined in the 2013 BiOp, consistent with the Proposed Action outlined in the 2013 BiOp, except as may be affected by this Order.

12. Each year this plan is in effect, the Bureau shall establish a 50,000 acre foot ("50 TAF") Reserve Water ("Reserve Water") supply to implement the emergency dilution flows modeled on Management Guidance #4 as described in paragraph 14 herein. Reserve Water shall be available from April 1 through the earlier of the two cessation dates identified in paragraph 14.d. and shall be utilized if the disease threshold criteria described in paragraph 14.c. are met or exceeded.

13. The Bureau shall manage the Klamath Reclamation Project ("Project"), including Project deliveries from upper Klamath Lake ("UKL"), in a manner that will not preclude the ability to provide Reserve Water to implement up to 50 TAF of emergency dilution flows and/or interfere with its ability to meet its obligations under the ESA with regard to endangered suckers and/or their critical habitat.

      **b.**     **Implementation of Emergency Dilution Flows**

14. Reserve Water for emergency dilution flows shall be released downstream of Iron Gate Dam ("IGD") following Management Guidance #4 when either of the disease threshold criteria described in paragraph 14.c. below is met.

      a.    Water releases to achieve 3,000 cfs at IGD shall be implemented immediately if the disease thresholds are met and flows at IGD are below 3,000 cfs. If flows at IGD already exceed 3,000 cfs, and have been at or above 3,000 cfs for at least seven days, flows to achieve 4,000 cfs at IGD shall be implemented. Flows at IGD shall be maintained or increased from 3,000 cfs to 4,000 cfs if disease levels remain above disease threshold criteria. If disease levels become

4

        reduced below the paragraph 14.c. thresholds, flows at IGD shall be reduced slowly while disease rates are monitored. Release of Reserve Water shall not count against the EWA and Reserve Water volume shall be capped at 50 TAF. If the 50 TAF of Reserve Water is expended before the 80% outmigration date as described in paragraph 14.d. below, the Bureau shall confer with the Parties to evaluate the feasibility and desirability of utilizing other water sources to prolong emergency dilution flows.

  b.    The volume of Reserve Water released shall be accounted for as the difference between the emergency dilution flow (*i.e.*, 3,000 cfs or 4,000 cfs) and the calculated IGD flow release based upon the formulaic approach for EWA distribution.

  c.    Emergency dilution releases using up to 50 TAF of Reserve Water shall be implemented when the following disease threshold criteria are met or exceeded:

      1.    Spore concentrations exceed 5 spores (non-specified genotype) per liter for the preceding sample based on quantitative polymerase chain reaction (qPCR) from water filtration samples at any sampling station;

      or (whichever occurs first)

      2.    The prevalence of infection of all captured juvenile Chinook salmon (both wild and hatchery) exceeds 20% in aggregate for the preceding week at the Kinsman Rotary Screw Trap.

  d.    Emergency dilution flows shall not be implemented or shall cease if an estimated 80 percent of the wild juvenile Chinook salmon have outmigrated past the Kinsman Rotary Screw Trap, or after June 15,

whichever occurs first. The predictive model currently under development by the U.S. Fish & Wildlife Service's ("USFWS") Arcata Field Office shall be used in making the 80% outmigration estimation determination. The Parties understand that the predictive model will identify a week at which 80 percent of the wild run has outmigrated. To account for model uncertainty and ensure a reasonable level of confidence that 80 percent of the wild run has outmigrated, the Bureau shall deem the date that is seven (7) additional calendar days after the last calendar day of the identified week to be the date that 80% of the wild run has outmigrated. If future refinements allow for a more accurate model prediction on a daily timestep, to account for uncertainty the Bureau shall deem the date that is seven (7) additional calendar days after the point identified by USFWS to be the date that 80% of the wild run has outmigrated. In the absence of a sufficient predictive model as determined by USFWS's Arcata Field Office, the Bureau shall deem the date that is seven (7) additional calendar days after the last calendar day of the estimated week provided by that Office to be the date that 80 percent of the wild run has outmigrated.

15. Klamath River flows at IGD and distribution of the EWA shall be implemented consistent with the approach for EWA distribution described in the 2013 BiOp except as set out in this Order. Deviations from the formulaic approach regarding the use of EWA to improve conditions for coho salmon may occur subject to the procedures in (a) through (f) below and consistent with the 2013 BiOp except for (e)-(f) below:

   a. The FASTA ("Flow Account Scheduling Technical Advisory") Team may recommend deviations to the Bureau, NMFS, and USFWS.

  b. The Bureau and NMFS may also make recommendations to deviate from the formulaic approach consistent with the purpose of improving conditions for coho salmon including to address urgent ecological concerns such as mitigating fish disease.

  c. In the event that the Bureau and/or NMFS recommend deviations, the Agencies shall coordinate with FASTA prior to implementation with the goal of gaining consensus on the flow recommendation.

  d. Deviations shall not be implemented unless both NMFS and USFWS have determined that the resulting deviations will not result in adverse effects to ESA-listed species that would otherwise not occur without deviating from the formulaic approach.

  e. In the event that one or more of the disease threshold criteria identified in paragraph 14.c. is met while flow augmentation is occurring through deviation from the formulaic approach for the use of EWA under the FASTA process or as a result of an agency recommendation, IGD releases shall be adjusted to be consistent with Management Guidance #4. The volume of Reserve Water used to implement those flows shall be accounted for as the difference between the resulting flow and the calculated IGD flow release based upon the formulaic approach for EWA distribution (*i.e.*, not the discharge resulting from the deviation from the formulaic approach).

  f. If disease threshold criteria have been met and flows have been increased consistent with Management Guidance #4, the FASTA Team, or Agencies may recommend increased flows above those contained within Management Guidance #4 (3,000 cfs or 4,000 cfs at IGD) through the use of EWA.

**III. Adaptive Management**

16. Until reinitiated formal consultation is complete, the flushing flows and the emergency dilution flows shall be provided according to the terms in this Order, subject to adaptive management as set forth herein. The technical representatives of the parties shall collaboratively identify and discuss reliable, newly-identified information that may relate to

provisions of this Order and achieving the fish disease management purposes of this Order. If the Parties reach consensus that an amended flow plan is warranted before reinitiated formal consultation is completed, they may jointly submit such plan to the Court for approval.

### IV.     Conclusion

17.     The Parties shall meet and confer in a good faith attempt to resolve any disputes that may arise relating to the Bureau's implementation of the surface flushing flows, deep flushing flows, and emergency dilution flows ordered herein, and/or the adaptive management process in paragraph 16, prior to seeking further intervention from this Court.

IT IS SO ORDERED.

Dated March 24, 2017.

_____
HON. WILLIAM H. ORRICK
United States District Judge